IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| REFUGIO RUIZ-CORTEZ,<br><br> Plaintiff,<br><br> v.<br><br>CITY OF CHICAGO, CHICAGO POLICE OFFICERS GLENN LEWELLEN, NOEL SANCHEZ and UNKNOWN CHICAGO POLICE OFFICERS,<br><br> Defendants. | Case No. 11-cv-01420<br><br>Hon. Harry D. Leinenweber<br><br><br><br><br><br>JURY TRIAL DEMANDED |

## **THIRD AMENDED COMPLAINT**

 NOW COMES Plaintiff REFUGIO RUIZ-CORTEZ, by his attorneys, Smith, Johnson & Antholt, LLC, Daniel Radakovich and Raymond Smith, and complaining of Defendants, CITY OF CHICAGO, CHICAGO POLICE OFFICERS GLENN LEWELLEN, NOEL SANCHEZ, and UNKNOWN CHICAGO POLICE OFFICERS, as follows:

### Introduction

 1. This action, arising out of the violations of the U.S. Constitution and for transgressions of Illinois law caused by one or more of the Defendants, is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

## Jurisdiction and Venue

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1343(a), and venue is proper under 28 U.S.C. § 1391(b). All of the events giving rise to the claims asserted herein occurred within the District.

## Parties

3. Plaintiff Refugio Ruiz-Cortez was a twenty-nine year-old resident of Aurora, Illinois, where he worked construction at the time of the events at issue.

4. Defendants Glenn Lewellen, Noel Sanchez, and Unknown Chicago Police Officers, referred to collectively as the "Defendant Officers," were, at the time of this occurrence, Chicago Police Officers. They engaged in the conduct complained under color of law. They are sued in their individual capacities.

5. Defendant Officers Glenn Lewellen and Noel Sanchez worked together in the Narcotics Section within the Organized Crime Division of the Chicago Police Department.

6. Defendant City of Chicago, ("City") is a municipal corporation duly incorporated under the laws of the State of Illinois, and the employer and principal of all other Defendants.

## Factual Background

7. In 1999-2000 Plaintiff Refugio Ruiz-Cortez was framed in a criminal case in the Federal Court by all three Defendants and Saul Rodriguez, a paid city informant, in order to continue the Defendants protection of Saul Rodriguez so that

Saul Rodriguez could remain a viable informant for the City. Plaintiff was wrongfully convicted and was sentenced to seventeen (17) years in prison.

### The City Hires Saul Rodriguez as an Informant

8. On February 8, 1996, the Chicago Police Department arrested Saul Rodriguez on the charge of trafficking in marijuana. Defendant Lewellen was one of the arresting officers.

9. In February 1996, the City and the Narcotics Section of the Organized Crime Division of the Chicago Police Department recruited Saul Rodriguez, who was a major drug dealer who had connections with international cocaine traffickers, to be a paid informant.

10. Saul Rodriguez furnished information about the activities of other narcotics operations, including rival gangs, that enabled the Chicago Police Department to seize large amounts of cocaine, marijuana, and United States currency.

11. In return for this information, the City paid Saul Rodriguez approximately $1,000 per kilogram of cocaine that was seized. Under this arrangement, the City has documented that it paid Saul Rodriguez over $807,000 between 1996 and 2001.

12. The City and the Chicago Police Department allowed Saul Rodriguez to continue to operate his criminal enterprise unimpeded, so that he would not be suspected of being an informant and would continue to be in a good position to know about the activities of rival drug gangs.

3

13. In addition to paying Saul Rodriguez for this information, the City and the Chicago Police Department protected him from investigation and prosecution by local and federal law enforcement.

14. The Chicago Police Department did not prosecute Saul Rodriguez for the marijuana arrest of February 8, 1996, and kept this arrest off of his record.

15. The Chicago Police Department did not investigate or prosecute Saul Rodriguez for any other crimes he was committing while he was a paid informant.

16. Saul Rodriguez' continuing crimes included murder, kidnapping, extortion, robbery, and narcotic trafficking. Defendant Lewellen was a central figure who was actively involved in these facets of the criminal enterprise.

17. Chicago Police Officers told Sual Rodriguez when other informants were giving the DEA information about his criminal activities.

18. The Chicago Police Department, in the summer of 1996, successfully intervened with the DEA and the U. S. Attorney's Office in Chicago to prevent the investigation and prosecution of Saul Rodriguez in the trafficking of 154.6 pounds of marijuana by telling the Federal Government that he was critical as an informant to City narcotics investigations.

19. The Chicago Police Department and the federal government released, without charges, one of Saul Rodriguez' couriers who was arrested for his involvement with Glenn Lewellen and Saul Rodriguez in a kidnapping for ransom. This courier continued his work for the Saul Rodriguez enterprise.

4

20. In addition, Defendant Officer Lewellen used his office to feed information obtained from local law enforcement to the criminal enterprise regarding ongoing investigations, to divert law enforcement attention away from that enterprise, and to assist in narcotics trafficking.

21. According to the 2010 criminal indictment, Defendant Officer Lewellen "held himself out as a police officer when obtaining wholesale quantities of cocaine in the Chicago area." He was charged with racketeering conspiracy, conspiracy to distribute cocaine, kidnapping, robbery of 100 kilograms of cocaine and cash, and obstruction of justice for concealing the activities of the drug operation.

22. Defendant Officer Lewellen was indicted for illegal activities in his capacity has a Chicago police officer including specifically that he gave false testimony against Plaintiff on December 21, 1999 in the case of *United States v. Refugio Ruiz-Cortez*, 99 CR 493 (N.D. IL.).

### The Set Up of Mr. Ruiz-Cortez

23. In the summer of 1999, Saul Rodriguez was working with another drug dealer, Carlos Rodriguez.

24. In the spring-summer of 1999, a man introducing himself as Carlos met Plaintiff at two of the many Mexican-American community events that included a quinceniera and a horse racing event. Carlos learned that some of Plaintiff's extended family lived in Durango, Mexico.

5

25. At a celebration at a ranch in Wisconsin, Carlos asked the Plaintiff if he wanted to make some extra money by helping him with illegal activity, which the Plaintiff believed to involve drugs. Plaintiff refused, saying that the money he made from construction work was enough for him.

26. Sometime thereafter, Carlos approached Plaintiff at gas station near his home. Carlos stated that an accident would happen to Plaintiff's family if he did not cooperate with him.

27. Even though he was terrified about the safety of his eight-months' pregnant wife, Plaintiff refused to help Carlos.

28. A few days later, even though Plaintiff had not given Carlos the address of his Aurora apartment several men brought a duffel bag containing drugs to that apartment. This occurred a short time prior to June 23, 1999.

29. These men told Plaintiff that the drugs were Primo's, who Plaintiff believed to be Carlos.

30. Scared because of the threats to his family and because these dangerous men were at his home, Plaintiff allowed the drugs to be left there for fear that if he did not, his family would be harmed.

31. These henchmen told Plaintiff he would be contacted when someone would need access to his house to pick up the drugs. Plaintiff complied out of fear.

32. On or about June 23, 1999, Saul Rodriguez made Defendant Lewellen aware that narcotics dealers were going to pick-up drugs from Plaintiff's home.

6

33. Defendant Lewellen and other members of his unit waited for the narcotics dealers to drive away from the home.

34. These officers later seized the narcotics in Chicago.

35. The men who were arrested, made bond and fled the jurisdiction.

36. Saul Rodriguez was paid by the City for the drugs seized on June 23, 1999.

37. Because this arrest occurred under the purview of the Joint Task force which involved federal law enforcement, the DEA became aware of the interdiction.

38. Defendant Lewellen convinced federal authorities that the source of the drugs was the occupant of the Aurora apartment, not Carlos or Saul Rodriguez.

39. Sometime between June 23, 1999 and July 8, 1999, Saul Rodriguez sent his female drug courier to Plaintiff's Aurora apartment and she picked up a quantity of drugs.

40. On or about July 8, 1999, Saul Rodriguez and Lewellen developed a plan to frame Plaintiff, and at the same time direct the federal authorities away from Saul and Carlos' drug operation.

41. On or about July 8, 1999, Saul Rodriguez informed Lewellen and, through him, members of the joint task force, that drugs were to be moved from the Aurora apartment.

42. On July 8, 1999, Saul Rodriguez sent his female courier to Plaintiff's apartment.

7

43. That day, Plaintiff had been working construction and was dropped off at home after 6:00 p.m.

44. At around 7:30 p.m., Saul's courier took the remaining portion of the drugs. She asked Plaintiff to carry the bag of drugs to her car, but Plaintiff refused.

45. The courier put the duffel bag containing what she believed to be twenty kilograms of drugs in the trunk of her silver car.

46. Lewellen was waiting for her and told her to open the trunk of her car.

47. Lewellen took the bag from her trunk and told her to leave.

48. Plaintiff never left his apartment.

49. Lewellen falsely told federal investigators that the driver of the silver vehicle never left the car. Lewellen falsely claimed that Plaintiff carried a plastic Aldi bag containing ten kilograms of cocaine from his apartment toward the silver car, and when he saw Lewellen, he dropped the bag and ran back to his apartment.

50. Both Defendants Lewellen and Sanchez, in order to frame Plaintiff, falsely told federal investigators, "Sanchez was there with Officer Lewellen, Officer Sanchez pulled right behind him, and they recovered the plastic bag from the parking lot." Lewellen and Sanchez told the investigators that after seeing Plaintiff drop the bag, followed behind him, knocked on the door, and arrested him.

51. Lewellen and Sanchez searched the apartment, but no drugs, drug paraphernalia, or guns were found in Plaintiff's apartment.

52. Saul Rodriguez was paid $10,000 by the City of Chicago for his information.

8

53. Saul Rodriguez' female courier was allowed to escape arrest and his drug operation was again protected by the Chicago Police Department.

## The False Prosecution

54. Based on Lewellen's and Sanchez' reports and testimony, Plaintiff was indicted federally for possession of ten kilograms of cocaine with intent to distribute, through an alleged attempt to deliver narcotics in the parking lot.. These federal charges were false.

55. Lewellen withheld from the federal prosecutors and the Plaintiff material impeachment evidence regarding Lewllen's corruption and work in the drug trade with Saul Rodriguez.

56. All of the Defendants withheld from the federal prosecutors and Plaintiff that the City was paying Saul Rodriguez and had paid Saul Rodriguez as the informant in the Plaintiff's case. Nor did the Defendants reveal to federal prosecutors and Plaintiff that they were protecting Saul Rodriguez' operation.

57. Throughout the prosecution, sentencing and Plaintiff's decade-long imprisonment, Defendant Officers never revealed that Defendant Officer Lewellen was engaged in a criminal enterprise, for which he falsified evidence and committed perjury.

58. After Plaintiff had served ten years in prison, the U. S. Attorney's Office moved to dismiss the case against Plaintiff.

9

59. On June 1, 2010, the United States District Court vacated Plaintiff's criminal conviction and ordered that he be released immediately.

60. The judge wrote a letter of apology to the Plaintiff.

61. As a direct and proximate result of the misconduct described above, Plaintiff Refugio Ruiz-Cortez spent over ten years of his life incarcerated.

### The City's Deliberate Indifference

62. Throughout the 1990s, the City of Chicago maintained a *de facto* policy, practice and custom of failing to properly supervise, discipline and control its officers, which was the moving force behind the violations of Plaintiff's Constitutional rights.

63. Chicago police officers who engaged in repeated acts and/or patterns of criminal misconduct were not tracked, disciplined or controlled by the Chicago Police Department despite its knowledge that it was necessary to protect civilians from corrupt officers.

64. Municipal policy-makers have long been aware of the City's policy and practice of failing to properly monitor, control and discipline its police officers who engage in misconduct.

65. In this case the City of Chicago knew that Rodriguez was a drug dealer but paid him over $800,000.00 to act as their agent as an informant. With this knowledge, the City of Chicago allowed Rodriguez and Lewellen to be unsupervised when the highest degree of care should have been utilized.

10

66. Defendant City had an express written policy to have informants sign an agreement that they would not violate the law while serving as informants. As a result the City put its employees in a position where they were encouraged to hide, turn a blind eye, and cover-up the illegal activities of the informants it used. No mechanism was put in place to monitor or control the actions of informants or the police officers who worked with them.

67. The 1997 Report of the Commission on Police Integrity warned the City: "The overwhelming majority of officers answered that corruption is isolated to small groups of officers bent on making a lot of cash … any way they can. The widespread low level forms of corruption have been replaced by what some officers described as gang style intimidating … using the badge to get what you want on the street."

68. Despite the warning, no efforts were taken to rein in these rogue officers – such as Defendant Officer Lewellen – and as a result their abuses of authority continued with knowledge that they were "above the law."

69. This kind of corruption in the Chicago Police Department began long before Defendant Officer Lewellan's time and continued long after. A few examples include the following:

    a. In 1983, a group of tactical officers from the 10th District of the Chicago Police Department were convicted on federal charges involving accepting sexual favors, weapons, cash and video records to protect two West Side drug rings.

11

b. In 1989, a group of officers from Chicago's Wentworth neighborhood were convicted of taking thousands of dollars in protection payoffs from gamblers and drug dealers.

c. In 1996, a group of tactical officers from Chicago's Austin neighborhood were indicted for using their police authority to rob and extort money and narcotics from drug dealers.

d. In 1997, a group of tactical officers from Chicago's Gresham neighborhood were indicted for conspiracy to commit robbery and for sales of illegally confiscated narcotics.

e. In 1998, Chicago police Sgt. Miedzenowski was charged with criminal misconduct dating back to 1983. He and others had been running a drug distribution ring on Chicago's northwest side. The U.S. Attorney called him "the most corrupt cop" in Chicago history. He was convicted by the U.S. District Court in 2001.

f. In 2001, Chicago police Sgt. Patterson, the head of a tactical unit, and another officer were caught on videotape stealing cash and drugs from an area drug dealer.

g. In 2005, a group of tactical officers in Chicago's Englewood neighborhood were indicted for criminal misconduct dating back to at least 1999. Their abuses of authority included working with area drug dealers.

12

70. At the time of Plaintiff's arrest, the City had not implemented any written policy, practice or procedure to identify or track officers who repeatedly commit misconduct and abuse their authority.

71. Approximately three to four years prior, in approximately 1995 or 1996, the City had obtained a program called "brain maker" designed to track police officers who repeatedly engage in misconduct. The Department could have used this program to identify potential problem officers. The City, however, dropped the brain maker program and destroyed all data contained in the program (including the list of problem officers).

72. In January 2000 – within months of Plaintiff's arrest – Alderman Beavers, of the Chicago City Council, submitted an official resolution recognizing that "Chicago police officers who do not carry out their responsibility in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

73. As a result of the City's policies, practices and customs, officers such as Defendant Officer Lewellen were emboldened by their knowledge that they were "above the law" and would not be held accountable for their misconduct.

74. At the time of the arrest and criminal prosecution of Plaintiff, the Defendant Officers knew that the City would not subject them to any meaningful investigation and discipline. Their misconduct in this case was a direct result of the City's failure to adequately supervise, discipline and control its officers.

**Count I**

**42 U.S.C. Section 1983 – Due Process**

75. Each of the foregoing paragraphs is incorporated as if restated fully herein.

76. As described more fully above, all of the Defendants, acting under color of law, deprived Plaintiff of his Constitutional right to a fair trial under the Fourteenth Amendment of the United States Constitution.

77. In the manner described more fully above, Defendants deliberately withheld material impeachment evidence that would have shown that Defendant Officer Lewellen engaged in a pattern of misconduct and obstruction of justice.

78. Information relating to Saul Rodriguez, Defendant Lewellen, their criminal operations, and the events leading up to the arrest of Plaintiff were withheld from him by Defendants.

79. Lewellen and Sanchez gave false information and testimony to the federal authorities at the Plaintiff's trial.

80. The misconduct described in this Count was objectively unreasonable and undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

81. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that:

    a. As a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately supervise, discipline and

14


control its officers, such that its failure to do so manifests deliberate indifference;

      b. As a matter of both policy and practice, the Chicago Police Department facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading Chicago police officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses;

      c. As a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Chicago Police Department have abused citizens in a manner similar to that alleged by Plaintiff in this Count on a frequent basis, yet the Chicago Police Department makes findings of wrongdoing in a disproportionately small number of cases;

      d. Municipal policy-makers are aware of, and condone and facilitate by their inaction, a "code of silence" in the Chicago Police Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case; and

      e. As a matter of policy and practice, the City failed to utilize information available to it in order to identify and respond to patterns of misconduct by its officers.

82. As a result of this violation of his constitutional rights, Plaintiff suffered injuries including but not limited to emotional distress and wrongful incarceration.

## Count II
## 42 U.S.C. Section 1983 – Conspiracy

83. Each of the foregoing paragraphs is incorporated as if restated fully herein.

84. As described more fully above, the Defendants reached an agreement to falsely arrest Plaintiff, frame him for a crime that he did not commit, and violate his right to due process in violation of his constitutional rights.

85. Each of the Defendant Officers conspired to deprive Plaintiff of the impeachment evidence to which he was lawfully entitled and which would have led to a timely exoneration of the false charges.

86. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

87. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff.

88. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

89. As a result of the Defendants' conduct, Plaintiff suffered injuries including but not limited to emotional distress and wrongful incarceration.

## Count III
## Malicious Prosecution

16

90. Each of the foregoing paragraphs is incorporated as if restated fully herein.

91. The Defendant Officers caused the criminal proceedings against Plaintiff to be commenced and continued on false charges for which they knew there was no probable cause.

92. In subjecting Plaintiff to malicious prosecutions, Defendant Officers acted with malice.

93. The criminal proceedings were terminated in Plaintiff's favor.

94. The City is sued in this Count pursuant to the doctrine of *respondeat superior*, in that the Defendant Officers performed the actions complained of while on duty and in the employ of Defendant City, and while acting within the scope of this employment.

95. As a direct and proximate result of the malicious prosecution, Plaintiff suffered injuries including emotional distress and wrongful conviction.

## Count IV
## 745 ILCS 10/9-101

96. Each of the foregoing paragraphs is incorporated as if restated fully herein.

97. Defendant City of Chicago is the employer of all police officer Defendants.

98. The Defendant Officers committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

WHEREFORE, pursuant to 42 U.S.C. Section 1983, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages and, because the Defendant Officers acted maliciously, wantonly, or oppressively, Plaintiff seeks punitive damages against the Defendant Officers in the individual capacities, plus the costs of this action and attorney's fees, and such other and additional relief as this court deems equitable and just.

PLAINTIFF DEMANDS TRIAL BY JURY.

RESPECTFULLY SUBMITTED,

Refugio Ruiz-Cortez


    /s/ Christopher R. Smith
By: one of his attorneys


Christopher R. Smith
SMITH, JOHNSON & ANTHOLT, LLC
One North LaSalle, Suite 3040
Chicago, Illinois 60602

Daniel E. Radakovich
LAW OFFICES OF DANIEL E. RADAKOVICH
900 West Jackson Boulevard, Suite 5E
Chicago, Illinois 60607

Raymond J. Smith
LAW OFFICE OF RAYMOND J. SMITH
300 South Wacker Drive, Suite 1700A
Chicago, Illinois 60606