IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| REFUGIO RUIZ-CORTEZ, | |
| **Plaintiff,** | |
| v. | Case No. 11 C 1420 |
| CITY OF CHICAGO, CHICAGO POLICE OFFICERS GLENN LEWELLEN, NOEL SANCHEZ, and UNKNOWN CHICAGO POLICE OFFICERS, | Judge Harry D. Leinenweber |
| **Defendants.** | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the parties' Cross Motions for Summary Judgment. For the reasons stated herein, Defendant Noel Sanchez's and Defendant City of Chicago's Motions for Summary Judgment [ECF Nos. 239 and 247, respectively] are granted; Defendant Glenn Lewellen's Motion for Summary Judgment [ECF No. 232] is granted in part and denied in part; and Plaintiff Refugio Ruiz-Cortez's Motion for Summary Judgment [ECF No. 235] is denied.

## I. LEGAL STANDARD

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In making this determination, all facts and reasonable inferences are construed in favor of the nonmovant. *Id.* at 248-49. Nonetheless, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

Litigants may cite to "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to support their positions in summary judgment. FED. R. CIV. P. 56(c). However, "[a] party may not rely on inadmissible hearsay to avoid summary judgment." *MMG Fin. Corp. v. Midwest Amusements Park, LLC,* 630 F.3d 651, 656 (7th Cir. 2011). With some exceptions, "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997). Finally, "the proponent of hearsay bears the burden of establishing that the statement is admissible." *Hartford Fire Ins. Co. v. Taylor,* 903 F.Supp.2d 623, 640 (N.D. Ill. 2012).

## II.  **BACKGROUND**

Because all four parties in this case have moved for summary judgment, the Court must do a Janus-like recitation of the facts so that "[a]s to each motion the nonmovant's version of any disputed fact [is] credited." *Padilla v. City of Chi.*, 932 F.Supp.2d 907, 914 (N.D. Ill. 2013).  Despite the contentious exchanges of statements of facts, the parties here agree on substantial portions of the record.  Where there are disagreements, the Court will note whose version of the events is being recounted.  Facts that are specific to a party's argument as to a particular claim will be discussed in the analysis as they become relevant.

In 1999, Plaintiff Ruiz-Cortez ("Ruiz-Cortez") was convicted of possession with intent to distribute 10 kilograms of cocaine and sentenced to 17.5 years in prison.  *United States v. Ruiz,* 99-CR-493, ECF No. 35.  In 2010, ten years into serving his sentence, Ruiz-Cortez's conviction was vacated on the request of the United States Attorney's Office (the "USAO") and he was immediately released.  *Id.,* ECF Nos. 50, 52.  The cause for the dismissal was an investigation leading to eventual arrest of Defendant Chicago Police Officer Lewellen ("Lewellen").  As a result of Lewellen's arrest, the USAO concluded that "no reasonable fact-finder would have found the defendant guilty" and on this ground, moved to vacate Ruiz-

Cortez's conviction. *Id.,* ECF. No. 50. Importantly, one of the people whom Lewellen was charged of having conspired with was a police informant named Saul Rodriguez ("Rodriguez"). (*See, United States v. Rodriguez,* 09-CR-332.)

Lewellen was one of two Chicago police officers who had arrested Plaintiff back in 1999 and who testified at Plaintiff's trial. (*See,* ECF No. 234, Ex. D (Lewellen's Test. against Ruiz-Cortez).) During this time, Lewellen worked in the narcotics section of the Chicago Police Department ("CPD") as part of a 10-man team. (*See,* ECF No. 241, Ex. C (Sanchez's Dep.) 33-1:7.) Lewellen had recruited Rodriguez as a paid confidential informant ("CI") for the CPD in 1996. (*See,* ECF No. 233 (Lewellen's Statement of Facts ("SOF")) ¶ 3.) In accordance with CPD's policy, Lewellen had Rodriguez sign a form obligating the latter not to engage in any illegal activity while serving as a CI. (ECF No. 237, Ex. J.)

Shortly after Rodriguez signed this agreement, the Drug Enforcement Agency ("DEA") seized over 150 pounds of marijuana from his car. (ECF No. 244 (City's SOF) ¶ 40.) A DEA agent by the name of Alan Doescher ("Doescher") testified in a deposition taken for this case that he received two phone calls from Lewellen around this time. (ECF No. 234, Ex. X (Doescher's Dep.) 7:12-15.) According to Doescher, Lewellen informed him that Rodriguez was a CI and asked him to cease the investigation

because it could compromise other matters on which Rodriguez was providing information. (Doescher's Dep., 7:22-10:15, 48:22-50:18.) Doescher replied that he would need to speak to his superior at the USAO. (Doescher's Dep., 10:15, 50:20-24.) Doescher then relayed the conversation with Lewellen to Assistant US Attorney Haywood McDuffie ("McDuffie"). (Doescher's Dep., 21:9-19.) Sometime later, he received a letter from McDuffie informing him that "pursuant to [his] request," the USAO had terminated the investigation into Rodriguez. (ECF No. 237, Ex. L (McDuffie's Letter).) It does not appear from the factual record that Doescher or another attorney from the USAO communicated with other CPD or City of Chicago personnel about Rodriguez.

In 1997, Rodriguez was arrested by Chicago police officers with a handgun in his back pocket. (ECF No. 244, Ex. 22 (arrest report).) Rodriguez was charged with failure to register a firearm, but the case against him was nonsuited. (ECF No. 244, Ex. 23 (quasi-criminal complaint) and Ex. 24 (disposition in *People v. Saul Rodriguez,* No. 97125928701).)

Rodriguez proved to be a fruitful informant for the CPD. During the period from 1996 to 2000, Rodriguez provided information on 65 occasions, leading to the seizure of thousands of kilograms of cocaine and marijuana. (ECF No. 263, Pl.'s Resp. to City's SOF, ¶¶ 52-53 (admitting the above).) CPD

records show that Rodriguez was paid $803,359.00 for this information. *Id.* ¶ 54. As the records also show, one of the occasions for which Rodriguez provided information is that leading up to Ruiz-Cortez's arrest. (ECF No. 244, Ex. 25.)

Several weeks before Ruiz-Cortez's arrest, the DEA and the CPD's narcotics section had engaged in a joint investigation and surveillance of his residence based on information provided by Rodriguez that drug activity was being conducted at the location. (ECF No. 264 (Pl.'s Resp. to Lewellen's SOF) ¶ 16 (admitting the above).) During this surveillance, law enforcement observed two individuals removing a large package from Plaintiff's residence after meeting with a resident there. *Id.* at ¶ 17. The teams followed the individuals and searched their vehicle, finding 56 kilograms of cocaine in the package. The police arrested both men. *Id.* at ¶ 18.

On July 8, 1999, Defendant Lewellen and Defendant Sanchez ("Sanchez"), another member of the narcotics section, went to perform additional surveillance on Plaintiff's residence. (Pl.'s Resp. to Lewellen's SOF, ¶ 19.) According to Sanchez's testimony at Ruiz-Cortez's trial, his testimony at Lewellen's trial, as well as his deposition in this case, he and Lewellen arrived at the house sometime around 3:00 p.m., at which point Lewellen set up his surveillance at the back of the residence while Sanchez set up at the front and watched the residence from

his vehicle. (*See*, ECF No. 241, Ex. G (Sanchez's Test. against Ruiz-Cortez) 4-5; Ex. F (Sanchez's Test. against Lewellen) 10-11; and Ex. C (Sanchez's Dep.) 122:18-23.)

Sanchez stated that he could not see Lewellen from his position and that he did not see Ruiz-Cortez during the surveillance. (*See*, Sanchez's Test. against Lewellen at 13-16 and ECF No. 265 (Pl.'s Resp. to Sanchez's SOF) ¶ 10 (admitting that at no point when Sanchez was conducting surveillance in the front of the residence could he view Lewellen or the back of the residence).) Sanchez testified that he and Lewellen maintained contact during the stake-out, with Lewellen "calling out" to Sanchez periodic updates over the police radio and cell phones. (*See*, Sanchez's Test. against Ruiz-Cortez at 7 and Sanchez's Test. against Lewellen at 14.) At some point, Lewellen called out to Sanchez that a Hispanic man, dressed in all white, entered the back of the residence. Lewellen further reported that this man would periodically poke his head outside as if looking for something. (*See*, Sanchez's Test. against Ruiz-Cortez at 11-12 and Sanchez's Test. against Lewellen at 15-16.) Plaintiff, however, contends that Lewellen could not have seen him at his apartment before 6:00 p.m. since he did not get home until after that time. (*See*, ECF No. 262 (Pl.'s Resp. Sanchez's Mot. Summ. J.) 4-5.) Plaintiff argues that either Sanchez's testimony is false or Lewellen was lying to Sanchez about what

Lewellen saw, "hardly what . . . long time partners would do to each other." *Id.* at 6.

Sanchez testified that around 7:30 p.m. Lewellen called out that a silver car had approached the back of the residence and that the driver gave a head signal to the man in white who came outside when the car approached. (*See,* Sanchez's Test. against Ruiz-Cortez at 12-13 and Sanchez's Test. against Lewellen at 857-859.) Lewellen told Sanchez that the man went back to the residence after receiving the signal and then came out again, at which point Lewellen said, "this is it." *Id.* Sanchez understood this to mean that a narcotics transaction was happening. He called for backup, waited the few minutes for the first responding officer to arrive, and then sprinted to join Lewellen in the back. *Id.*

Sanchez further testified that when he reached the back of the residence, he saw that Lewellen was carrying a bag believed to contain narcotics. (*See,* Sanchez's Test. against Ruiz-Cortez at 15 and Sanchez's Test. against Lewellen at 859.) Lewellen motioned to Sanchez that the man in white had run back inside the residence. (*See,* Sanchez's Test. against Ruiz-Cortez at 15 and Sanchez's Test. against Lewellen at 859, 863.) Sanchez waited for Lewellen to secure the narcotics in the trunk of his car before following him to the apartment where Lewellen had seen the man disappear into. (*See,* Sanchez's Test. against

Ruiz-Cortez at 15 and Sanchez's Test. against Lewellen at 863-864.) The officers knocked and Ruiz-Cortez, dressed all in white, answered the door. Lewellen then placed Ruiz-Cortez under arrest. (*See,* Sanchez's Test. against Ruiz-Cortez at 15 and Sanchez's Test. against Lewellen at 865.)

After the arrest, Lewellen and Sanchez spoke to DEA agents who had also arrived on the scene. One of the DEA agents, Rebecca Branum ("Branum"), authored a DEA report and an affidavit and testified at a preliminary hearing to Ruiz-Cortez's trial. As Branum was not at the scene until after the arrest, her account of what happened was not based on personal knowledge but rather her understanding and recall of what the police officers told her. (*See,* ECF No. 241, Ex. H (Branum's Prelim. Test.) 7 and ECF No. 241, Ex. I (Branum's Dep.) 13:21-16:21.)

At Ruiz-Cortez's trial, Lewellen testified to personally observing the events relayed above. (*See,* ECF No. 234, Ex. D, 25-59.)

Ruiz-Cortez took the stand at his trial. He denied ever having seen the yellow bag in which the drugs were recovered during the evening of July 8, 1999. (*See,* ECF No. 234, Ex. A. 210:9-10 and Pl.'s Resp. to Lewellen's SOF ¶ 39.) As Ruiz-Cortez stated to the judge during his sentencing hearing, "I never had those drugs in my house." (ECF No. 234, Ex. B 7:15-17

and Pl.'s Resp. to Lewellen's SOF ¶ 47.)   He did not present
duress as a defense.  (Pl.'s Resp. to Lewellen's SOF ¶ 40.)

   In 2012, a jury convicted Lewellen of conspiracy to possess
with intent to distribute cocaine.  (*Rodriguez*, 09-CR-332, ECF
No. 802.)   Rodriguez, a co-defendant in the case, cooperated
with the Government and testified against Lewellen.   Rodriguez
testified that Lewellen told him to keep selling drugs after
signing him up at as a CI; that "if I got arrested he would keep
me out of it"; that Lewellen "was able to talk to them" when
Rodriguez was arrested in 1997 with a gun; and that when the CPD
stopped paying Rodriguez a thousand dollars for each kilogram of
cocaine seized, Lewellen "ma[d]e it right" by giving Rodriguez
two kilograms of cocaine.  (ECF No. 237, Ex. G (Rodriguez's
Test.), 2892:21-2911.)

   As is relevant to Ruiz-Cortez's arrest, Rodriguez testified
that he told Lewellen that he was sending one of his couriers, a
woman by the name of Lisette Venegas ("Venegas"), to pick up 20
kilograms of cocaine "from one of Changa's supplier's worker."
(Rodriguez's Test. at 2922-2924.)   Rodriguez expected that if
Lewellen or other officers seized money or drugs as a result of
the information he provided, he would get paid as a CI and
Venegas, a woman that Lewellen knew from before, would be let
go.  (*Id.* at 2923-2924.)   This transaction turned out to be the
event leading up to Ruiz-Cortez's arrest.

Venegas stated in her deposition that on July 8, 1999 she
went to Ruiz-Cortez's address to pick up drugs per Rodriguez's
instructions. (ECF No. 241, Ex. R (Venegas's Dep.), 27:15-
32:23.) Rodriguez told her that "[a] guy is going to come out,
he's going to give you something, just grab it and take it."
(*Id.* at 34:2-8.) Venegas stated that she arrived at the
apartment "sometime in the morning," possibly before noon, and
grabbed a bag from a Hispanic guy. (*Id.* at 34:16-35:5.) She
pulled up to the back of the house, "walked up a couple of steps
and kind of went halfway in and halfway out, and he was already
there. And I grabbed the bag and turned around and left." (*Id.*
at 34:9-15.) After she got the bag, Venegas walked to her car
and put it in the trunk. (*Id.* at 39:18-21.) She did not get in
her car, however, as "there was another car blocking my way."
(*Id.* 43:4-45:17.) The driver of the car, a white male, opened
her trunk, grabbed the bag, and told her to get out of there.
(*Id.* 46:1-48:5.) Venegas drove away and saw the other vehicle
take off in the opposite direction. (*Id.* 48:7-49:5.)

Plaintiff brings this suit against Chicago police officers
and the City of Chicago. (ECF No. 131, Third Am. Compl.) In
his Complaint, Plaintiff admitted that he indeed stored cocaine
at his apartment but alleged that he did so under the coercion
of Carlos Rodriguez ("Carlos"), a.k.a. Changa, who was, as later
discovered, a criminal associate of Saul Rodriguez. (*Id.* ¶¶ 23,

30.) Plaintiff said that Carlos approached him several times, offering him an opportunity to make more money than he was currently earning, but that Plaintiff refused him each time. (*See,* ECF No. 241, Ex. D (Ruiz-Cortez's Dep.) 66-68.) Carlos then insinuated that Plaintiff's family would meet with an "accident" if he did not accede to his demands. (*See,* Compl. ¶¶ 25-26 and Ruiz-Cortez's Dep. 80-85.) Still, Plaintiff refused. (*See,* Compl. ¶ 28 and Ruiz-Cortez's Dep. 86-87.) Carlos and another man then showed up at Plaintiff's apartment one week later with bags containing narcotics. Carlos told Plaintiff, "You have to do it. Think about your family." (*See,* Compl. ¶¶ 28-30 and Ruiz-Cortez's Dep. 98-103.) Plaintiff understood that he was to store the drugs until people came to pick them up. (*See,* Ruiz-Cortez's Dep. 110-113.)

Plaintiff admitted that he kept the cocaine picked up by the two individuals that the DEA and CPD arrested. (ECF No. 264 (Pl.'s Resp. to Lewellen's SOF) ¶¶ 16-17.) He also admitted that moments before his arrest, Venegas met him at his apartment and took the cocaine stored there. (Ruiz-Cortez's Dep. 163-174.) He disputes, however, that Lewellen saw him do so in the manner Lewellen testified to at Plaintiff's trial. According to Ruiz-Cortez, Venegas came to his apartment to retrieve the drugs, got into the apartment, took the cocaine, and then walked off to her car alone. (Ruiz-Cortez's Dep. 168-173.) Lewellen

intercepted the woman, took the drugs, and let her go because he knew she was a part of his co-conspirator's criminal enterprise. (ECF No. 237 (Pl.'s SOF) ¶¶ 46, 53 (relying on Rodriguez's Test. against Lewellen and Venegas's Dep.).) Lewellen also kept half of the drugs to himself and only inventoried 10 kilograms to the system instead of the 20 kilograms that the woman took from Plaintiff's apartment. (Pl.'s SOF ¶¶ 44 (relying on Rodriguez's Test. against Lewellen).) Lewellen then came to Plaintiff's door with Sanchez to arrest him.

In sum, Plaintiff alleges that Lewellen and Sanchez framed him for the crime and the City of Chicago is also responsible. He brings a Motion for Partial Summary Judgment against Lewellen and the City of Chicago. In turn, Lewellen, Sanchez, and the City seek summary judgment against Plaintiff.

### III. <u>ANALYSIS</u>

Ruiz-Cortez names as Defendants in this lawsuit Lewellen and Sanchez, other unknown Chicago police officers, and the City of Chicago. Against the named individual Defendants, Plaintiff asserts the following causes of action: a Due Process claim based on fabrication of evidence and withholding of *Brady* materials (Count I); a claim for conspiracy to violate Plaintiff's Due Process rights (Count II); and a malicious prosecution claim based on Illinois law (Count III). Against the City of Chicago, Plaintiff brings a single municipality

liability or *Monell* claim (Count IV).  After discussing some preliminary matters, the Court addresses each of these causes of action in turn.

### A.  Unknown Chicago Police Officers

The City of Chicago moves to have the unknown Chicago police officers dismissed from the case.  The Court grants this request.

Plaintiff has not attempted to name or serve with process any Chicago police officers other than Sanchez and Lewellen. Discovery appears to have closed, and the trial date is now less than two months away.  In line with Seventh Circuit precedent, the unnamed defendants should be dismissed.  *See, Williams v. Rodriguez,* 509 F.3d 392, 402 (7th Cir. 2007) (dismissing an unnamed defendant from the case due to the plaintiff's "failure to identify this defendant and the lack of any record that this individual was served with process").

In addition, because more than two years have passed since Plaintiff's criminal case was dismissed, any new defendants will have a statute of limitations defense.  *See,* 745 Ill. Comp. Stat. Ann. 10/8-101 (setting the statute of limitations for an Illinois malicious prosecution claim at one year) and *Dominguez v. Hendley,* 545 F.3d 585, 588 (7th Cir. 2008) (explaining that in Illinois, the statute of limitations for § 1983 claims is two years).  Therefore, the unknown officers are dismissed from this

case.  *See, Baker v. Ghidotti,* No. 11 C 4197, 2014 U.S. Dist. LEXIS 41750, at *36 (N.D. Ill. Mar. 28, 2014) (dismissing unnamed defendants for the same reasons).

### B. Ruiz-Cortez's Perjury

Defendant Lewellen argues that Ruiz-Cortez should not be allowed to bring this lawsuit since he perjured himself at his criminal trial.  Lewellen acknowledges that the power to dismiss the claims of a party who perjured himself is at the discretion of a district court.  *See, Secrease v. W. & S. Life Ins. Co.,* 800 F.3d 397, 401 (7th Cir. 2015) (reviewing "for an abuse of discretion the court's selection of dismissal or default as a sanction for serious misconduct").  This Court declines to dismiss Plaintiff's lawsuit.

As the Seventh Circuit has said, "while perjury is a serious offense, one can imagine cases in which a sanction of dismissal would be excessive." *Allen v. Chi. Transit Auth.,* 317 F.3d 696, 703 (7th Cir. 2003).  In particular, where "the opposing litigant had perjured himself as well," dismissal may be inappropriate given the "the egregiousness of the conduct . . . in relation to all aspects of the judicial process." *See, id.* and *Dotson v. Bravo,* 321 F.3d 663, 667 (7th Cir. 2003) (internal quotation marks omitted).

In this case, Plaintiff and Lewellen both have leveled accusations of perjury against one another.  Even assuming for

the sake of the argument that Lewellen is correct and Plaintiff is an admitted perjurer who is guilty of the underlying crime, it was Lewellen's criminal misconduct that allowed Plaintiff to be released from prison when he still had seven more years to serve. Whether true or not, the USAO was of the belief that "in light of the newly-discovered evidence [of Lewellen and associates' illicit activities] there is virtually no admissible evidence of defendant's guilt" and so moved to have Ruiz-Cortez immediately released from prison. *United States v. Ruiz,* 99-CR-493, ECF No. 50. *See also,* FED. R. EVID. 803(3) (allowing for the use of the USAO's filing as evidencing its motive or intent when it moved to dismiss Plaintiff's indictment). If Lewellen is right, then a guilty man was let free, and this injustice was due to the effect Lewellen's conduct had on the USAO's ability to prosecute. Lewellen thus comes to this Court with "unclean hands," and the Court will not preemptively shield him from civil penalties by dismissing Plaintiff's suit. *See, Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 815(1945) (stating that the doctrine of unclean hands "gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant").

## C. Lewellen's Fifth Amendment Invocations

Ruiz-Cortez and Lewellen argue over how this Court should treat Lewellen's Fifth Amendment invocations at his deposition.

In this circuit, courts considering summary judgment motions may draw adverse inferences against civil litigants who invoke their Fifth Amendment right. *See, SEC v. Lyttle,* 538 F.3d 601, 604 (7th Cir. 2008) (reviewing a grant of summary judgment and explaining that evidence of wrongdoing could be "enforced by the inference . . . of guilt from [a defendant's] refusal to testify"). *See also, Padilla,* 932 F.Supp.2d at 919. Such adverse inferences are permissive and not required. *Evans v. City of Chi.,* 513 F.3d 735, 741 (7th Cir. 2008).

For several reasons, this Court will not use the invocation of the Fifth Amendment against Lewellen. First, the questions that Plaintiff asked Lewellen during his deposition for which he asserted his Fifth Amendment privilege are questions that form the crux of Plaintiff's case against Lewellen – to-wit, that Lewellen testified falsely regarding what he saw in the hours leading up to Plaintiff's arrest. If the Court were to deem Lewellen's silence as admissions to the questions, this would come perilously close to entering judgment against Lewellen. But silence, and adverse inferences drawn from it, cannot be the sole basis for finding liability. *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir. 1995) ("Silence is a relevant factor to be considered in light of the proffered evidence, but the direct inference of guilt from silence is forbidden.").

Second, the questions that Plaintiff asked Lewellen on which Lewellen invoked his Fifth Amendment are on matters that implicate other Defendants in this case. For example, Plaintiff asked, "And when Sanchez testified at the Ruiz-Cortez trial that you radioed him that Ruiz-Cortez was carrying the plastic bag, that testimony of Sanchez was false, wasn't it?" and "Did you falsely testify against Ruiz-Cortez at his trial as part of the CPD's plan to protect Saul Rodriguez as an informant by diverting the attention of the federal authorities from your and Saul Rodriguez's drug-dealing activities and onto Ruiz-Cortez?". Drawing an adverse inference on questions like this would unfairly prejudice Co-Defendants Sanchez and the City of Chicago.

Finally, the Court also finds it relevant that one of the allegations the government brought in Lewellen's criminal case was obstruction of justice "including but not limited to, the December 21, 1999 false testimony of GLENN LEWELLEN in *United States v. Refugio Ruiz-Cortez*" but that the jury did not convict Lewellen on this count of racketeering conspiracy. *See, Rodriguez,* 09-CR-332, ECF No. 271 (Third Superseding Ind.) 8-9. Therefore, the Court will not infer, as Plaintiff would have it, that "Lewellen's answers would, if truthful, tend to subject him to criminal liability."

## D.  Evidentiary Issues

The parties have raised a host of evidentiary issues, including numerous requests that the Court strike opposing parties' assertions and responses for violating Local Rule 56.1. Requiring strict compliance with local rules is within the discretion of the district courts and is done (at least partly) so that the courts do not have to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 527-29 (7th Cir. 2000). The Court, having waded, forgoes wholesale striking of responses. It will consider the content of the parties' Statements of Facts as well as their evidentiary foundation in reviewing the parties' Motions.

## E.  Fabrication of Evidence Claim

Finally, we arrive at Plaintiff's first cause of action whereby Plaintiff asserts that Sanchez and Lewellen violated his Due Process by fabricating evidence used against him. It should be emphasized that this fabrication claim is distinct from a Due Process claim stemming from a failure to disclose under *Brady*. *See, Gauger v. Hendle,* 349 F.3d 354, 360 (7th Cir. 2003) (explaining that the problem for the defendant "was not that evidence useful to him was being concealed; the problem was that the detectives were giving false evidence") *rev'd on other grounds,* 440 F.3d 421, 4223 (7th Cir. 2006). *See also,*

*Saunders-El v. Rohde,* 778 F.3d 556, 561-62 (7th Cir. 2015).
Simply put, a *Brady* claim focuses on what the officers should
have said (but did not), whereas a fabrication claim rests what
the police officers *did* say.

While the case law of the circuit was not always clear, it
is by now settled that "[a] criminal defendant's due process
rights may be violated — actionable by way of 42 U.S.C. § 1983 —
when the evidence against him is fabricated." *Saunders-El,* 778
F.3d at 558. The *Saunders-El* court clarified that none of the
earlier cases from the Seventh Circuit, including *Fox v. Hayes,*
600 F.3d 819 (7th Cir. 2010), *Brooks v. City of Chicago,* 564
F.3d 830 (7th Cir. 2009) and *Newsome v. McCabe,* 256 F.3d 747
(7th Cir. 2001), "stands for the proposition that fabricating
evidence does not violate a defendant's due process." *Id.* at
560. Insofar as the Defendants in this case rely on those
earlier cases to argue to the contrary, that argument is
rejected.

The Individual Defendants are correct, however, that their
testimonies at Ruiz-Cortez's criminal trial cannot form the
basis for Plaintiff's Complaint. This is because the officers
are protected by absolute immunity in their roles as witnesses.
*See, Manning v. Miller,* 355 F.3d 1028, 1031-32 (7th Cir. 2004)
(explaining that when police officers testify as witnesses, they
are "granted absolute immunity from civil liability").

Plaintiff concedes as much, stating: "Plaintiff's due process claim is not predicated on Defendant's testimony as a witness at Plaintiff's criminal trial, but rather on Defendant's role in fabricating evidence prior to testifying at trial." (ECF No. 262 at 10.)

The Court now reviews what evidence the Individual Defendants allegedly fabricated outside of their trial testimonies.

### 1. *Fabrication Claim against Sanchez*

Plaintiff has not produced any statement directly authored by Sanchez that Plaintiff can say is false. A false piece of evidence is an essential element of a fabrication claim, and Plaintiff must make a showing "sufficient to establish the existence" of this element to survive summary judgment. *See, Fields v. Wharrie,* 740 F.3d 1107, 1110 (7th Cir. 2014) ("Fabricated testimony is testimony that is made up; it is invariably false.") *and Celotex Corp.,* 477 U.S. at 322-23. Instead of any direct statements of Sanchez, Plaintiff relies on the statements of Branum, the DEA agent who talked to Lewellen and Sanchez after Plaintiff's arrest, to adduce that Sanchez fabricated evidence. In particular, Plaintiff relies on Branum's DEA report, affidavit, and testimony at a preliminary hearing.

All of these statements are hearsay insofar as they are introduced to establish that Sanchez actually told Branum the events that she memorialized or testified to. Plaintiff believes otherwise, arguing that Branum's statements "would not be offered for the truth of the matter" and so would not be hearsay. (ECF No. 262 at 12.) This is incorrect. In *Eisenstadt,* the plaintiffs had to point to a material misrepresentation that the defendant Centel allegedly made and their best candidate was a *Chicago Tribune* article based on an interview Centel gave. *Eisenstadt v. Centel Corp.,* 113 F.3d 738 at 742. The *Eisenstadt* court held: "The article, however, is hearsay: an out-of-court statement offered to prove the truth of its contents – to prove, that is, that Centel or its investment bankers made the comments attributed to them." *Id*. Branum's statements here are hearsay in the same way that the article was hearsay in *Eisenstadt*.

While hearsay can still be admitted into evidence if the Rules of Evidence so provide, and Plaintiff may have several venues opened to him to make an argument for admissibility here, Plaintiff has not made any such argument. On this ground alone, the Court can exclude the statements since as the proponent of hearsay, Plaintiff bears the burden of showing that it is admissible. *Hartford Fire Ins.,* 903 F. Supp. 2d at 640.

Nonetheless, for the sake of completeness, the Court rules that Branum's various statements – even if admitted and viewed in the most favorable light of Plaintiff – do not make a sufficient showing that *Sanchez*, not Lewellen, reported falsely to Branum.

First, Branum's DEA report contained multiple instances of "CPD Officer Lewellen said" but did not once mention Sanchez's name in the narrative. (ECF No. 266, Ex. I.) When shown the DEA report during her deposition in this case, Branum volunteered that, "It was clear that Officer Lewellen was doing all the information for me that – I was probably directing things more through him. He was telling me what happened when I arrived at the scene." (Branum's Dep. at 91:11-17.) Second, Branum's affidavit did not indicate which of the two officers, Lewellen or Sanchez, supplied the details that Branum laid out in her report. (*See,* ECF No. 266, Ex. J.)

Third, during the preliminary hearing, Branum recounted the events leading up to Plaintiff's arrest from Lewellen's point of view. (*See,* Branum's Prelim. Test. at 7:11-9:6.) Branum also offered the following testimony, the underlined answer being what Plaintiff emphasized over and over (but somewhat misquoted each time) in building his case against Sanchez:

A.    He [Ruiz-Cortez] walked toward the silver vehicle with the bag.

Q.   What happened at that time?

A.   And at this point Police Officer Glenn Lewellen pulled into the south parking lot from his fixed surveillance point and when he pulled into the south parking lot, Ruiz dropped the bag in the parking lot and fled back into the south door first floor east apartment and the silver vehicle simultaneously pulled out and went southbound, I believe down Locust.

Q.   Did law enforcement personnel recover the bag that Mr. Ruiz had dropped?

A.   *Yes.  Sanchez was there with Officer Glenn Lewellyn [sic].  Officer Sanchez pulled around right behind him and they recovered the yellow plastic bag from the parking lot.*

(*Id.* at 10.)    Probed by Plaintiff's counsel during her deposition in this case, Branum testified that she based this particular answer on "what I was told by one of the two officers that were on the scene, and I don't recall which ones." (Branum's Dep. 20:13-18.)

Plaintiff would have the Court draw the inference that this answer by Branum is based on something that Sanchez (and not Lewellen) told her.   There is no indication of that in the answer itself or in Branum's deposition.   Plaintiff also would have the Court interpret the phrases "there with Officer Glenn Lewellen" and "pulled around right behind him" to mean that Sanchez saw Ruiz-Cortez drop the bag and "recovered the yellow plastic bag" to mean that Sanchez picked up the bag from where Ruiz-Cortez dropped it (or at least saw Lewellen pick up the bag

- 24 -

from the ground of the parking lot), as these are the only parts of the narrative Plaintiff can claim to be false.

This is stretching the bounds of reasonable inference, the only kind of inferences the Court is obligated to make in favor of Plaintiff as the nonmovant. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987). Plaintiff can make a showing of falsehood only if Branum's two-sentence answer is interpreted as conveying such temporal immediacy from when Ruiz-Cortez dropped the bag and when Sanchez arrived on the scene that Sanchez must have seen Ruiz-Cortez drop the bag and must have at least observed Lewellen pick up the bag from the ground. This would require inference upon inference, all piled on a slender reed of an answer that is hearsay and cannot with any comfortable certainty be attributed to Defendant Sanchez.

Furthermore, even if the underlined statement reasonably can be construed to mean that Sanchez said he saw Ruiz-Cortez drop the bag, this evidence is still not enough make out a Due Process violation against Sanchez. This is because Plaintiff must still show causation between this allegedly false statement and his injury, which is in this case his prosecution, conviction and incarceration. *See, e.g., Whitlock v. Brueggemann,* 682 F.3d 567, 582-83 (7th Cir. 2012).

In particular, Plaintiff must show that his "injury would not have occurred absent the conduct." *Id.* (internal quotation

marks omitted). Given that Lewellen reported all he had (allegedly) seen before making the arrest, including that he saw Ruiz-Cortez drop the bag of drugs, Plaintiff cannot plausibly argue that he would have gone free but for Sanchez telling Branum that he also saw Plaintiff drop the bag. This is especially true in light of the fact that both Lewellen and Sanchez testified at Ruiz-Cortez's trial that only Lewellen saw Ruiz-Cortez drop the bag. (*See,* Sanchez's Test. against Ruiz-Cortez, 100:22-101:13 and Lewellen's Test. against Ruiz-Cortez, 47:14-52:5.) In short, Plaintiff cannot show that "the officer's act (fabrication) caused any injury." *Id.* at 582.

In addition to Branum's statements, Ruiz-Cortez brings some circumstantial evidence to raise the inference that Sanchez lied. First, Plaintiff makes much of the fact Sanchez and Lewellen had worked together for about a year in the ten-man narcotics section by the time Plaintiff was arrested. As such, Sanchez must have been privy to the effort to frame Ruiz-Cortez because that Lewellen would lie to Sanchez is "hardly what the jury would conclude that long time partners would do to each other." (ECF No. 262 at 6.) But this is pure speculation and must be disregarded.

Ruiz-Cortez further contends that Sanchez's statement to the effect that he and Lewellen began surveilling Plaintiff's apartment around 3:00 p.m. is inconsistent with what others have

said. However, the evidentiary support that Ruiz-Cortez cites shows no inconsistencies. Ruiz-Cortez regrettably mis-characterizes the record. For example, he contends that Sanchez could not have "conducted a significant period of surveillance on Plaintiff's residence [because] Saul Rodriguez testified that he directed Lewellen to Plaintiff's apartment only minutes before the cocaine was seized." (ECF No. 262 at 12-13.) The record that Plaintiff cites, Rodriguez's testimony at pages 2922-2924, however, does not contain any reference as to when Rodriguez directed Lewellen to Plaintiff's apartment. (*See also,* ECF No. 278 (City's Resp. to Plaintiff's SOAF) ¶ 95) (correctly noting that Plaintiff misrepresented Branum's preliminary hearing testimony regarding the time of the surveillance).

Finally, Plaintiff points to aspects of the surveillance that he considers odd and that purportedly support the inference that Sanchez lied. These consist of Sanchez and Lewellen beginning surveillance without "the aid of immediate backup," Sanchez not knowing that Rodriguez was the particular informant who supplied the information regarding this address before the stake-out began, and Sanchez agreeing with Lewellen not to pursue the silver vehicle allegedly because conditions were not ideal. But Plaintiff has put on no evidence that officers who were not fabricating evidence likely would not do these things.

Do police officers on surveillance in similar circumstances normally have immediate back-up, know the name of the source of the information, or give chase after a vehicle? Plaintiff has not said, and the Court cannot make a reasonable inference of suspicious behavior out of thin air.

In sum, because Plaintiff has not produced any evidence that Sanchez fabricated evidence nor tied any of the alleged fabrication to Plaintiff's injury, the Court grants Sanchez Summary Judgment on this count.

### 2. Fabrication Claim against Lewellen

To support his fabrication claim against Lewellen, Plaintiff relies on Rodriguez's testimony, Venegas's deposition, and his own account of what happened. All three sources, claims Plaintiff, make it "uncontested" that Lewellen lied to federal law enforcement and authored false police reports. Plaintiff argues that this evidence against Lewellen will be "unrebutted here because of Lewellen's exercise of the Fifth Amendment" and therefore Plaintiff is deserving of summary judgment. Plaintiff overstates his case.

As long as "a reasonable jury could return a verdict for" Lewellen, Plaintiff's motion for summary judgment must be denied. *Anderson,* 477 U.S. at 248. And a reasonable jury may return a verdict for Lewellen even if he does not bring any affirmative proof to support a finding of no liability. As a

Defendant in the case, Lewellen may prevail at trial by casting doubt on the witnesses' credibility and by drawing out inconsistencies in their testimonies.

Issues concerning the witnesses' credibility are certainly present in the case. Rodriguez is a convicted murderer and drug dealer; Venegas is his confessed drug courier; and Ruiz-Cortez admits to lying at his criminal trial. As for inconsistencies: Rodriguez called Plaintiff "Changa's supplier's worker" when Plaintiff insists that he was an unwilling pawn in Changa's (Carlos's) machinations. Venegas testified that she arrived at Plaintiff's apartment and saw him on the day in question "in the morning," possibly before noon, when Plaintiff in his own account stresses that he was working construction all day and did not arrive home until after 6:00 p.m. Plaintiff's story on how he came to store drugs in his house has also changed, as reflected in the various complaints filed in this case. (*Compare,* ECF No. 56 (First Am. Compl.) ¶¶ 25-26 *with* ECF No. 131 (Third Am. Compl.) ¶¶ 28-30.)

With all facts and reasonable inferences construed in favor of Lewellen, the Court must conclude that a reasonable jury may find for the Defendant at trial. Plaintiff's summary judgment is thus denied.

Lewellen presses for summary judgment in his own favor. Lewellen first argues that Plaintiff improperly added the

fabrication of evidence Due Process claim in his briefing and that this claim was not in his Complaint. Lewellen is correct that "a brief cannot amend a complaint and add new legal claims." *Savage v. Finney,* No. 12 CV 2398, 2012 U.S. Dist. LEXIS 86425, at *9 (N.D. Ill. June 20, 2012) (citing Seventh Circuit cases). However, in looking at Plaintiff's Third Amended Complaint (the latest and operative Complaint in this case), the Court finds that Plaintiff pled sufficient facts to put Lewellen on notice that Plaintiff was bringing a fabrication claim. The Complaint alleged that Lewellen committed affirmative falsehoods and not just that he withheld evidence. (*See,* ECF No. 131, ¶¶ 49-50, 79.) While Plaintiff's pleading could have been more transparent, his Complaint contains a fabrication claim.

Lewellen next argues that Plaintiff's fabrication of evidence claim must fail as a matter of law. This is because the pre-trial statements and reports authored by Lewellen that Plaintiff claims are false contain the "exact same information" as Lewellen's testimony at Plaintiff's criminal trial. Since absolute immunity protects Lewellen's trial testimony, Lewellen believes that the pre-trial materials do not provide a basis for a fabrication claim.

Lewellen's argument is unconvincing. Insofar as Lewellen's argument is that his testimony at trial somehow immunizes his

pre-trial activities, this argument has been rejected. As an investigator who allegedly fabricated evidence, Lewellen's own subsequent conduct "cannot be an intervening cause sufficient to defeat a finding of causation" and ultimate liability. *Whitlock,* 682 F.3d at 584.

If Lewellen's argument instead is that his pre-trial statements cannot have caused Plaintiff's injury because they were not introduced at Plaintiff's trial, this argument proves too much. If fabricated testimony introduced at trial is protected by absolute immunity, and fabricated evidence not introduced at trial cannot be used to make out a Due Process claim against a defendant – even if its content is identical to what was testified to at trial – then fabrication of evidence can never violate Due Process. This is contrary to case law. *See, e.g., id.* at 585 ("[T]he deliberate manufacture of false evidence contravenes the Due Process Clause.").

Indeed the prosecutor defendant in *Whitlock* tried and failed on a similar argument. The defendant there argued that the only wrong in the case – the introduction of perjured testimony leading to a criminal conviction – "is the one that occurred at trial." Since the defendant was acting within his immunized prosecutorial capacity at trial, any fabrication he participated in prior to trial "is beyond the reach of the law."

*Id.* at 583.   The Seventh Circuit rejected the defendant's argument and affirmed the denial of his summary judgment motion.

Cases that Lewellen cites to support his position are inapposite.   In *Bianchi v. McQueen,* Bianchi could not sustain his claim that the defendants fabricated evidence, not because the fabricated evidence was put away "in a drawer" and "no further use [was made] of it," but because Bianchi was acquitted at his criminal trial.   *Bianchi v. McQueen,* 818 F.3d 309, 313, 319 (7th Cir. 2016).   As such, there was no deprivation of liberty, and the claim fails on this essential element.   *Id.* The same applies to *Buckley v. Fitzsimmons,* 509 U.S. 259, 261 (1993), where the prosecution dropped charges before Buckley's second trial began, and *Lofton v. Eberle,* No. 14 C 898, 2015 U.S. Dist. LEXIS 13574 at *6 (N.D. Ill. Feb. 5, 2015), where the case was dismissed via a *nolle prosequi.*

The only cases Plaintiff cites where there were deprivations of liberty are distinguishable from the present matter.   In *Starks v. City of Waukegan,* the fabricated evidence not introduced at trial did not mirror what was introduced. *See, Starks v. City of Waukegan,* 123 F.Supp.3d 1036, 1046-47 (N.D. Ill. 2015).   This is unlike this case, where Plaintiff actually emphasizes that the content of his pre-trial statements are "the same" or contain the "exact same information" as what he testified to at trial.

This leaves only *Munoz v. Rivera,* a case dealing with a motion to dismiss. *Munoz v. Rivera,* 169 F.Supp.3d 815 (N.D. Ill. 2015). There, the plaintiff failed to state a claim due to inadequate pleading of facts. The alleged fabricated evidence in *Munoz* were vague allegations that the defendants "falsely reported" what they had seen or heard. *Id.* at 818. As the court noted, "the complaint does not identify or describe the particulars of any 'false reports'" nor "does it allege who received those reports or how they were used." *Id.* at 810. In contrast, Plaintiff in this case has pointed to the specific police reports that Lewellen made. Since the reports contained the same information that Lewellen testified to at his trial, and the information is what Lewellen "called out" to Sanchez and reported to Branum, we know who received the information and how it was used in this case.

In sum, the authorities Lewellen relies on do not support the proposition he makes. The Court therefore denies Lewellen summary judgment on this claim.

### F. *Brady* Claim

A duty to disclose information under *Brady v. Maryland,* 373 U.S. 83 (1963) extends to police officers. *See, Carvajal v. Dominguez,* 542 F.3d 561, 566 (7th Cir. 2008). As the Seventh Circuit has explained, "[a] *Brady* violation can be broken down into three basic elements: (1) the evidence at issue is

favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued – in other words, 'materiality'." *Id.* at 566-67. Further, evidence is "suppressed" only when "(1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Id.* Finally, "[e]vidence is 'material' if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*

### 1. Brady Claim against Sanchez

Against Sanchez, Plaintiff first advances the argument that Sanchez's "fabrication of knowingly false evidence regarding the circumstances of Plaintiff's arrest is a violation of *Brady*." (ECF No. 262, 15.) This is incorrect as a matter of law. In *Saunders-El,* the plaintiff had argued "both that the fabrication of evidence violated his constitutional rights and, separately, that the police officers' failure to admit their misdeeds to the prosecution amounts to a withholding of exculpatory evidence in violation of *Brady*." *Id.* at 561. The court rejected this argument, finding that it contravenes case law to allow such a

recast of an evidence fabrication claim as a so-called *Brady* claim.   *Id.* at 562.

*Manning v. Miller,* a case cited by Plaintiff, does not hold otherwise.   *Manning* is an older case in which the plaintiff brought a *Brady* claim but not a fabrication claim.   *See, Manning v. Miller,* 355 F.3d at 1030-31.   The court found the facts of the case to be "unique" and made the narrow ruling that "based on the specific facts of this case, we believe that Manning has presented a *Brady* claim."   *Id.* at 1033.   The court did not hold that simultaneous fabrication and *Brady* claims are viable where the latter rests on police officers withholding the fact that they fabricated evidence.

Moreover, insofar as Plaintiff is aware of the circumstances surrounding his arrest – that he did not drop the bag of cocaine in the parking lot, that instead the drug courier "Venegas was present and in possession of narcotics in the parking lot immediately prior to Plaintiff's arrest" and that Venegas was not arrested – the information was not suppressed. *See, Gauger,* 349 F.3d at 360 (stating that "the duty to disclose falls out" when the suspect "knew what he had said at the interrogation").

Plaintiff next argues that a genuine issue of material facts exists "regarding whether Defendant knowingly failed to disclose material information regarding Lewellen's relationship

with Rodriguez." (ECF No. 262, 16.) Plaintiff then lists nine pieces of evidence whose nondisclosures he claims violated his *Brady* rights. *Id.* at 16-17. But under *Brady,* "the evidence suppressed must be exculpatory or impeaching," and some of the facts Plaintiff lists do not meet this standard. *Carvajal,* 542 F.3d at 568.

Evidence that falls into this category includes any failure to disclose that an informant by the name of Saul Rodriguez provided information leading to Plaintiff's arrest. As Plaintiff admits, "the breadth and depth of the criminal activities of Rodriguez . . . could not have even been imagined" from the identity of the informant. (*See,* Pl.'s Resp. to Lewellen's Mot. Summ. J. at 16.) To be a favorable fact to Plaintiff, any information not disclosed would at least need to have been reasonably probable to alert Plaintiff that something was amiss with Rodriguez's use as an informant. Only then is it plausible that Plaintiff would have investigated Rodriguez further and perhaps discovered facts about the informant that would have exculpated Plaintiff or (more likely) allowed Plaintiff to impeach "star police officer witness" Lewellen and thus secured a favorable outcome to himself. *See, Carvajal,* 542 F.3d at 568-70 (explaining the standard for evidence to be considered "favorable"). Rodriguez's identity alone would not have done that, and neither would the fact that "Rodriguez

earned $10,000 as a paid informant in Plaintiff's case," since CPD policy authorized the payment of such fees. *See, Harris v. Kuba,* 486 F.3d 1010, 1016 (7th Cir. 2007) (stating that when "evidence is arguably favorable only after several inferences are made . . . [t]his stretches the meaning of 'favorable' beyond that of *Brady*").

So much for several of Plaintiff's pieces of "material evidence relating to Rodriguez . . . never disclosed." Those that remain relate to Rodriguez's and Lewellen's joint criminal activities. Plaintiff brings circumstantial evidence that Sanchez knew about Rodriguez's involvement in crimes and knew of Lewellen's pattern of misconduct (by using and paying Rodriguez) and obstruction of justice (in protecting Rodriguez from prosecution). The Court finds, however, that even viewed in the light most favorable to Plaintiff, the evidence does not create a genuine issue of disputed fact.

Take the evidence that Sanchez knew about Rodriguez's criminal activities first. This includes the fact that Sanchez had "babysat" Rodriguez a handful of times when Rodriguez came to the police station to collect his payment as an informant. (Pl.'s SOAF ¶ 33.) This evidence establishes that Rodriguez and Sanchez had contact. However, the Court cannot infer from this that Sanchez knew of Rodriguez's criminal activities. It is unreasonable to think that while sitting in the middle of a

police station, presumably in presence of many police officers, waiting to get paid under an agreement obligating him not to commit crimes, Rodriguez would have started telling Police Officer Sanchez of his large-scale drug dealings, kidnappings, or murders.

Plaintiff also stresses the facts that Sanchez worked on "numerous" investigations – in Plaintiff's view, perhaps as many as 30 – on which Rodriguez was the informant. (Pl.'s SOAF ¶ 30.) Viewed in the light most favorable to Plaintiff, this may support the inference that Sanchez knew that Rodriguez was a prolific informant. For this to have kindled suspicion, however, Plaintiff would need to bring evidence having some tendency to show that Sanchez should have known that a law-abiding informant would not be able to supply information for this many investigations. The closest Plaintiff comes to this is via the expert opinion he submitted. Joseph Stine ("Stine"), Plaintiff's expert, opined in his report that:

> Professional law enforcement officers know that the useful "life" of a cooperating individual (C/I) who follows the rules is limited.
>
> The lengthy duration of the flow of information from Saul Rodriguez regarding high level illegal drug shipments and stash houses for drugs and drug money should have been a red flag for any *supervisor* who was not blinded by the bright lights of high profile seizures . . . This information was readily available to *supervisory personnel* whose job it was to make sure the C/I was in conformity with the policies and procedures designed to prevent the abuses and criminal

> activity that were occurring on a regular basis by
> these agents of the CPD.

(ECF No. 244, Ex. 27 (Stine's Rep.) 11-12 (emphasis added).)
Taking Plaintiff's expert opinion at face value, the evidence
supports an inference that CPD supervisory personnel should have
been alerted that Rodriguez was not "follow[ing] the rules."  It
is undisputed, however, that Sanchez was not a supervisor at the
CPD.  Stine thus does not suggest that *Sanchez* should have known
about Rodriguez's criminal activities.  Indeed the expert said
nothing about how long the "useful life" of a lawful CI should be
and so leaves the Court with no basis for inferring that the
"numerous" investigations on which Sanchez participated where
Rodriguez was an informant extend beyond this proper longevity.

As for the allegation that Sanchez should have known about
Lewellen's illicit activities, Plaintiff brings nothing more than
the circumstantial evidence he brought under his fabrication of
evidence claim.  That evidence was that Sanchez and Lewellen
worked together and Plaintiff considers suspicious certain
aspects of the surveillance leading up to his arrest.  The Court
found the evidence insufficient to create a genuine dispute of
material fact there, and it is also insufficient here.

Plaintiff has provided the Court with no basis to conclude
that the officers' conduct on the surveillance is indicative of
wrongdoing.  For example, why is two officers going to surveil a

residence alone (as opposed to in groups of three? four?) suspicious? Of course, if one assumes that the officers were engaging in misconduct, then anything they did looks suspicious. But this is putting the cart before the horse. The standard is not whether an accusation of wrongdoing can shade generally unobjectionable conduct in a nefarious light. Rather, the evidence itself must raise the inference of wrongdoing.

Likewise, unless it is reasonable to infer that everybody who worked with Lewellen in the narcotics section for as long as Sanchez did (two years in total and a year by the time of Plaintiff's arrest) knew or should have known of Lewellen's criminality, the fact that the two men worked together raises no genuine dispute of material fact.

For these reasons, the Court grants Sanchez's Motion for Summary Judgment on this Count.

### *2. Brady Claim against Lewellen*

In his Motion for Summary Judgment against Lewellen, Plaintiff makes the bold claim that Lewellen's withholding of "material and impeachment evidence" is "undisputed." Lewellen disagrees. What may be treated as a matter of no genuine dispute is Lewellen's criminal conviction for conspiring with Rodriguez. But the one case that Plaintiff cites to go from there to this Court granting him summary judgment actually features a denial of both the plaintiff's and the defendants'

motions for summary judgment. *See, Thompson v. City of Chi.,* No. 07 C 1130, 2009 U.S. Dist. LEXIS 20348, at *7 (N.D. Ill. Mar. 12, 2009). Given the disposition of the opinion, the Court is frankly puzzled as to why Plaintiff cited it in his own Motion for Summary Judgment. Plaintiff's Motion is denied.

In the Cross-Motion for Summary Judgment, Lewellen argues that Plaintiff's *Brady* claim fails as a matter of law. In particular, he contests that (1) any *Brady* materials were suppressed, (2) any suppressed evidence was material, and (3) any damages resulted from a *Brady* violation.

### a. Suppression of Materials

Plaintiff's first argument that no *Brady* materials were withheld includes both an evidentiary and a substantive prong. The evidentiary attack is that Plaintiff had not produced the file of his criminal defense attorney and so the defendants do not know what, if anything, was withheld. Lewellen, however, cannot plausibly contend that he disclosed to Ruiz-Cortez information on his and Rodriguez's criminal activities. This is especially true since he is still disputing (via his criminal conviction appeal and his briefing in case) that he engaged in criminal activities. So whatever may have been in Ruiz-Cortez's attorney's file, it was at least missing this piece of information.

On substantive grounds, Lewellen argues that he has no obligation under *Brady* to disclose his criminal relationship with Rodriguez. For this proposition, he relies on *Saunders-El*'s language that "*Brady* does not require the creation of exculpatory evidence." *Saunders-El,* 778 F.3d at 562. But the undisclosed evidence in *Saunders-El* and the cases cited therein all involved facts that the plaintiffs must have known themselves. *See, Saunders-El,* 778 F.3d 558 (suppressed information was that police officers had "bludgeoned" the plaintiff and "collected his blood in order to smear it at the crime scene"); *Gauger,* 349 F.3d at 356-57, 360 (suppressed evidence was Gauger's own statements at the interrogation); *Sornberger v. City of Knoxville,* 434 F.3d 1006, 1029 (7th Cir. 2006) (suppressed evidence was coercive circumstances leading to the plaintiff's confession); and *Harris,* 486 F.3d at 1013, 1016-17 (suppressed statement was a lie by the police officers to the prosecutor about the plaintiff's relationship with another person who confessed to the crime) ("Harris knew about his relationship, or lack thereof, with Davis. He was fully capable of challenging the officers' and prosecutors' contention to the contrary."). Such facts do not need to be disclosed because their nondisclosure would not be considered suppression under *Brady* anyway. *Carvajal,* 542 F.3d at 567 (7th Cir. 2008).

In contrast, the *Brady* materials that Plaintiff claims had been withheld in this case relate to things that ranged far outside Plaintiff's knowledge. They include Rodriguez's involvement in crimes and Lewellen's pattern of misconduct and obstruction of justice – things that Plaintiff at the time of his arrest and criminal trial knew nothing about. (*See,* ECF No. 233 (Lewellen's SOF) ¶¶ 98-106.) *Saunders-El* and its line of cases do not compel the conclusion that Lewellen did not violate *Brady* by keeping mum about his criminal activities.

### b. Materiality of suppressed information

Lewellen further challenges that any evidence he did not turn over is material. Lewellen claims that this is because evidence regarding his criminal activities would not have been admissible and even if admissible, the evidence could not "reasonably have changed the outcome of the trial."

It is true that to be deemed "material" under *Brady*, evidence must be admissible. *United States v. Silva,* 71 F.3d 667, 670 (7th Cir. 1995). Further, the Rules of Evidence provide that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." FED. R. EVID. 608(b). Lewellen argues that given this prohibition on extrinsic evidence, Ruiz-Cortez's defense counsel would not have been able

to elicit any admissible evidence to impeach when faced with Lewellen's denials of wrongdoing. As such, any evidence of Lewellen's wrongdoing "would not have made a difference in the result of the trial." *See, United States v. Veras,* 51 F.3d 1365, 1375 (7th Cir. 1995).

Lewellen, however, failed to say that under Rule 608(b), a district court has discretion to allow such extrinsic evidence "if they are probative of the character for truthfulness or untruthfulness of the witness." FED. R. EVID. 608(b)(1). Given that Lewellen provided crucial testimony to convict Ruiz-Cortez – thus distinguishing his case from the other cases he cited – it is reasonable to suppose that the presiding judge at Ruiz-Cortez's trial may have allowed extrinsic attacks on Lewellen's credibility. Such impeachment may have, with reasonable probability, changed the result of the proceeding. In any event, Lewellen cannot establish as a matter of the law that the evidence would have been ruled inadmissible.

Lewellen also argues that evidence of his illicit activities could not have had a plausible probability of changing the outcome of Ruiz-Cortez's trial when the evidence is considered within the context of "the trial themes and theories presented by" Ruiz-Cortez. Ruiz-Cortez's theory at his own trial was that his prosecution was based on a case of "mistaken identity"; his theory in this case is that while coerced into

holding drugs, he could not have been seen in public with the drugs. Under either theory, the credibility of the lone witness who testified that he saw Ruiz-Cortez drop a bag of drugs is likely crucial. Put differently, Ruiz-Cortez may not have needed to put on any defense at all had Lewellen's "character for untruthfulness" been known. Construing all facts in favor of Ruiz-Cortez, he had a reasonable probability of walking free had he had the opportunity to impeach Lewellen with the withheld information.

### c. Damages

Lastly, Lewellen asserts that Ruiz-Cortez can recover no damages because he "was in prison for an offense that he undisputedly committed." Plaintiff is "undisputedly" guilty because even had he presented an affirmative defense of duress at his criminal trial, he would still have been convicted since Carlos's threat of harm to Plaintiff's family was not imminent and did not deprive Plaintiff of an opportunity to flee or seek the help of law enforcement.

Even allowing that Lewellen is correct, however, Plaintiff has raised a triable issue that he was deprived of a fair trial. *See, Brady,* 373 U.S. at 87 ("The principle of [our holding] is . . . avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials

are fair; our system of the administration of justice suffers when any accused is treated unfairly.").

It is true that without an injury, there can be no tort. *Fields,* 740 F.3d at 1114. But this rule only means that had Ruiz-Cortez been acquitted at his criminal trial, he may not be able bring a *Brady* claim at all. *Carvajal,* 542 F.3d at 570 (expressing doubts that "an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation."). Here, Ruiz-Cortez was convicted and spent ten years in prison. It may be that in a fair trial, he would have received the same sentence, but he arguably did not receive a fair trial.

Viewed in the light most favorable to Plaintiff as the nonmovant, Rodriguez's, Venegas's, and his own account of what happened may convince a jury that Lewellen lied. A reasonable jury may therefore agree with Plaintiff that "whatever evidence the government presented through Defendant [Lewellen] would have been thoroughly discredited had the true nature of his relationship with Rodriguez not been suppressed." (ECF No. 261 at 18.) If this is so, then the government would not have carried its burden and Ruiz-Cortez would have not served the 10-year sentence even if, in fact, he was guilty of the underlying crime.

The three out-of-circuit cases Lewellen cites on this point are unpersuasive. In *Olsen v. Correiro,* 189 F.3d 52, 55 (1st

Cir. 1999), the criminal defendant pled guilty to a lesser charge of manslaughter for time served. Here, Ruiz-Cortez has not pled guilty to anything for his ten years in prison. In *Townes v. City of N.Y.,* 176 F.3d 138 (2d Cir. 1999), the Second Circuit was primarily concerned with setting the right level of deterrence on police misconduct where the police did not personally benefit from their illegal search and seizure. *See, Townes,* 176 F.3d at 141. In such a case, the court found that to award the plaintiff monetary damages would "vastly overdeter police officers and would result in a wealth transfer that 'is peculiar, if not perverse.'" *Id.* at 147-48. In this case, Lewellen has been found guilty of conspiring to possess with intent to distribute cocaine and ordered to pay over $6 million in forfeiture for his crime. *Rodriguez,* 09-CR-332, ECF No. 1344. More proximately, Lewellen is accused of pocketing 10 kilograms of cocaine in the events leading to Ruiz-Cortez's arrest. Faced with such facts, it is not clear that the Second Circuit would have found the transfer of wealth away from Lewellen to be "perverse" or that monetary damages would "vastly overdeter" the lucrative police misconduct. Finally, *Padilla v. Miller*, 143 F.Supp.2d 453, 459-60 (M.D. Pa. 1999) is a case factually similar to *Townes* where the judge allowed the plaintiffs to proceed to trial and only there awarded them with nominal damages.

For these reasons, the Court denies Lewellen's Motion for Summary Judgment on Plaintiff's *Brady* claim.

### G. Conspiracy Claim

"To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer,* 776 F.3d 500, 510 (7th Cir. 2015).

#### 1. Overt Act

Sanchez, the only party to have been granted summary judgment on the underlying Due Process violation, argues that he cannot be liable for conspiracy to violate Plaintiff's constitutional rights when he is not liable for the underlying violation. The Court finds it more helpful to frame Sanchez's argument as an argument that he has not committed any "overt acts in furtherance" of the conspiracy that actually deprived Plaintiff of his Due Process rights. Indeed, because the Court granted Sanchez summary judgment on Count I, Sanchez cannot be said to have "fabricated or suppressed evidence" and thereby deprived Plaintiff of his Due Process rights.

Plaintiff argues that Sanchez is nonetheless liable for conspiracy because he "condoned, facilitated, or knowingly turned a blind eye to Lewellen's misconduct." (ECF No. 262 at

20.)  This "condoned, facilitated, or knowingly turned a blind eye" language comes from *Jones v. Chicago,* 856 F.2d 985, 992 (7th Cir. 1988), which Plaintiff cites, but there the court was talking about *supervisory* liability.  The court in *Jones* said, "To be held liable for conduct of their subordinates, supervisors must have been personally involved in that conduct . . . The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."  *Id.*  Plaintiff blithely replaced "The supervisors" with "A police officer" and goes on to state that the law is that "A police officer who knows about misconduct and facilitates it, approves it, condones it, or turns a blind eye for fear of what he might see is liable for conspiracy." (ECF No. 262 at 20.) (*See also,* ECF No. 261 at 21.)

Even under this formulation, however, Plaintiff has to make a sufficient showing that Sanchez knew about Lewellen's misconduct.  Plaintiff fails to do so, as explained previously. *See,* Section III, Part F.1.

### 2. Agreement between Co-Conspirators

Agreement is an essential element of conspiracy.  *Fields v. City of Chi.,* No. 10 C 1168, 2014 U.S. Dist. LEXIS 14621, at *33 (N.D. Ill. Feb. 6, 2014) (citing *Reynolds v. Jamison,* 488 F.3d 756, 764 (7th Cir. 2007)).  "A conspiratorial agreement may be established by circumstantial evidence, but only if a reasonable

jury could conclude that the conspirators had, in fact, reached an understanding that they sought to injure" Plaintiff. *Alexander v. City of S. Bend,* 433 F.3d 550, 557 (7th Cir. 2006).

The Court notes that Sanchez and Lewellen are alleged to have conspired with each other but neither Individual Defendant has been accused of conspiring with a third-party. Thus, the only party with whom the Individual Defendants could have come to a mutual understanding to deprive Plaintiff of his constitutional rights is each other.

The evidence Plaintiff brings to raise the inference that Sanchez and Lewellen came to an agreement is the same evidence he brought to support his Due Process claim. This included Branum's statements (labeled as "of greatest import"), the Defendants' work together on the same team, the work with Rodriguez, their travel to Plaintiff's residence by themselves without immediate backup, their false statements to federal authorities, their identical story of surveillance, and their testimonies at Plaintiff's criminal trial. (*See,* ECF No. 262 at 21-24 and ECF No. 261 at 22-23.) For the reasons given previously, none of this evidence, individually or together, is sufficient to raise a genuine dispute of material fact. *See,* Section III, Part E.1 and Part F.1.

To the extent that Plaintiff shades any evidence in a new light, he now highlights the fact that on the night of

Plaintiff's arrest, Sanchez and Lewellen "were in regular contact at all points throughout the alleged surveillance." (ECF No. 261, 21-22.) According to Plaintiff, this raises an inference of conspiracy because it shows that the "defendants had an opportunity to confer at [the] relevant time." *Id.* But the Seventh Circuit has ruled that phone calls and contact cannot by themselves raise an inference of conspiratorial agreement. *See, Goetzke v. Ferro Corp.,* 280 F.3d 766, 778 (7th Cir. 2002) ("To assert that the calls [between alleged conspirators] are evidence of a conspiracy is simply speculation.") and *Alexander,* 433 F.3d at 557 ("The phone calls among officers are nothing more than evidence that the officers remained in contact as they investigated the crimes; without more, to conclude that such phone calls establish a conspiracy is the purest of conjecture."). *See also, Johnson v. Dossey,* 878 F. Supp. 2d 905, 922 (N.D. Ill. 2012) (stating that the plaintiff "fails to provide any evidence that these calls and communications were anything other than routine law enforcement communications").

Plaintiff's remaining contentions do not rise above the level of speculation. For instance, Plaintiff says that "It is impossible to reconcile a coordinated series of events involving information provided by a confidential informant, the alleged surveillance of a residence, the apprehension of a drug courier,

the recovery of narcotics, the release of a drug courier, and the substitution of Plaintiff into the role of the person possessing the narcotics with the acts of a single cop acting independently." (ECF No. 261 at 23.) Plaintiff does not say why he finds it impossible that Rodriguez provided Lewellen with information (as Rodriguez said he did), that Lewellen surveilled the part of the residence where he could see Plaintiff, that the officer alone intercepted Venegas, took the narcotics from her, and let her go (as she described in her deposition), and that Lewellen then told other law enforcement that Plaintiff was the person who possessed the drugs. The Court declines Plaintiff's invitation to speculate that more than one officer must have been involved, especially when witnesses on whose testimonies Plaintiff is relying contradict his conjecture.

For the above reasons, the Court grants Sanchez's and Lewellen's Motions for Summary on Count II of the Complaint.

## H.  Malicious Prosecution Claim

The elements of a malicious prosecution claim under Illinois law are:  "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud,* 169 Ill. 2D 504, 512 (1996) (internal

quotation marks omitted).  "The absence of any one of these elements bars a plaintiff from pursuing the claim." *Id.*

### 1. *Malicious Prosecution Claim against Sanchez*

Sanchez argues that he had probable cause to arrest Ruiz-Cortez. Under Illinois law, "[b]arring any intervening events, a finding that a defendant had reasonable grounds to arrest a plaintiff is also sufficient to satisfy the probable cause requirement for instituting criminal proceedings against the plaintiff.  Accordingly, in such circumstances, that finding of the equivalent of 'probable cause' should serve to bar an action for malicious prosecution." *Johnson v. Target Stores, Inc.,* 341 Ill. App. 3d 56, 80 (2003).  Because the Court has found that Sanchez did not act improperly after the arrest by giving false testimony or withholding *Brady* materials, there is no "intervening event" as to Sanchez.  It is therefore proper to focus on whether he had probable cause to arrest Ruiz-Cortez in reviewing the malicious prosecution claim against him.

Police officers have probable cause to make an arrest when "in light of the facts and circumstances within their knowledge at the time of the arrest," the officers reasonably believe "that the suspect had committed or was committing an offense." *United States v. Parra,* 402 F.3d 752, 763-64 (7th Cir. 2005). Moreover, "courts evaluate probable cause not on the facts as an omniscient observer would perceive them but on the facts as they

would have appeared to a reasonable person in the position of the arresting officer – seeing what he saw, hearing what he heard." *Id.* (internal quotation marks omitted).

Sanchez argues he had probable cause to arrest Plaintiff because a reasonable person in his position hearing the "call outs" from a fellow police officer would believe that Ruiz-Cortez possessed narcotics. According to Sanchez, Lewellen told him that a man dressed in all white was in the back parking lot with narcotics. When he joined Lewellen the back, he saw Lewellen with a bag of what was believed to be cocaine and which he believed Lewellen had recovered from where the man dropped it. Sanchez and Lewellen went to where Lewellen indicated the man had fled; a man in all white came to the door and Lewellen put him under arrest. If the evidence, viewed in the light most favorable to Plaintiff, does not reasonably dispute this narrative, then Sanchez had probable cause to arrest. *See, e.g., Reynolds v. Jamison,* 488 F.3d 756, 768 (7th Cir. 2007) (allowing "law enforcement officer to effect an arrest in reliance on information supporting probable cause supplied by other officers") (citing *United States v. Hensley,* 469 U.S. 221, 232-33 (1985)); *Parra,* 402 F.3d at 764 (adopting the doctrine that "the police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer

. . ."); *and Duran v. Sirgedas,* 240 F. App'x 104 (7th Cir. 2007)
("An officer may reasonably rely on information provided by
other officers."), vacated on other grounds by an opinion in the
same case.

The question then is whether a genuine dispute of material
fact exists as to this version of events. Plaintiff says yes,
but he has brought no actual evidence to support his claim.
Plaintiff has evidence – in the form of his own testimony,
Rodriguez's testimony, and Venegas's deposition – that things
did not happen as Lewellen described them to Sanchez, but he has
not produced any evidence that Sanchez did not hear Lewellen
describe these things.

Plaintiff again cites to Branum's testimony, characterizing
it as Barnum having said that both Lewellen and Sanchez "pulled
up into the parking lot behind the Plaintiff's residence, saw
Plaintiff heading into the apartment after dropping narcotics,
and identified Plaintiff as the person who was in the parking
lot." (ECF No. 262 at 26.) As discussed previously, Branum
said no such things. *See,* Section III, Part E.1.

Not wishing to concede that Sanchez had probable cause to
arrest if his version of events is not disputed, Plaintiff
hypothesizes that, "Even were Defendant's story of surveillance
true, his experience as narcotics officer, his role as
Lewellen's partner, and the precise coordination needed to run a

two-man surveillance operation call into question Defendant's purported ignorance of the actual events." The Court does not know what it is in Sanchez's experience as a police officer, his role in the narcotics section, or the coordination behind a surveillance operation that would cast doubt on his testimony. If it is anything more than what the Court has already rejected (*i.e.,* Sanchez and Lewellen's time together in the narcotics section), Plaintiff did not say, much less support with evidence from the record. The Court thus finds that Sanchez had probable cause to arrest Plaintiff. *See, Potts v. City of Lafayette,* 121 F.3d 1106, 1112 (7th Cir. 1997)( stating that "if the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists") (internal quotation marks omitted) and *Fabiano v. City of Palos Hills,* 336 Ill. App. 3d 635, 642 (2002) (same).

Redundantly, the Court also finds that because the evidence in the record, even when viewed in the light most favorable to Ruiz-Cortez, does not create a sufficient showing that Sanchez gave false testimony, provided false reports, or withheld *Brady* materials, Sanchez did not act with malice in prosecuting Plaintiff. *See, Holland v. City of Chi.,* 643 F.3d 248, 255 (7th Cir. 2011) (noting that "because the police had probable cause in this case and because there is no alternative basis for establishing malice, [the plaintiff] can establish neither" a

lack of good faith nor malice).  The Court grants Sanchez summary judgment.

### 2.  *Malicious Prosecution Claim against Lewellen*

For the same reasons that the Court denied Plaintiff's summary judgment on Count I, the Court denies Plaintiff's Motion for Summary Judgment against Lewellen on Count III as well.  A reasonable jury is not required to believe Plaintiff's evidence, consisting of his, Rodriguez's, and Venegas's testimonies, that events unfolded as Plaintiff claims.  There is thus a genuine dispute of material fact as to whether Lewellen maliciously prosecuted Plaintiff.

Lewellen brings his own Motion for Summary Judgment.  He argues that several elements of a malicious prosecution claim are lacking, including termination of Plaintiff's criminal proceeding in a manner indicative of innocence, probable cause, and damages.  Lewellen adopts his damages argument from earlier, and the Court likewise repeats that for the same reasons, Lewellen's argument is rejected.

The Court further rejects Lewellen's contention that Ruiz-Cortez's criminal proceeding did not terminate in a manner indicative of innocence.  Illinois adopts the Restatement (Second) of Torts in defining when an abandonment of the proceedings is indicative of the innocence of the accused.  *See, Swick,* 169 Ill. 2d at 512-13.  The Restatement, in turn, states

that "The abandonment of the proceedings because the accuser believes that . . . a conviction has, in the natural course of events, become impossible or improbable, is a sufficient termination in favor of the accused." Restat 2d of Torts, § 660, cmt. d (2nd 1979). Thus, a criminal proceeding terminates in a manner indicative of innocence when it is "impossible or improbable" that a court of law will find the accused guilty. This is what happened in this case. Whether or not Ruiz-Cortez possessed narcotics, his criminal proceeding ended in a manner indicative of his legal innocence because "no reasonable fact-finder would have found the defendant guilty." *Ruiz,* 99-CR-493, ECF No. 50.

Lewellen's strongest argument may be that he had probable cause to arrest Ruiz-Cortez. However, this is not sufficient to defeat a malicious prosecution claim because, unlike with Sanchez, there is a genuine dispute of material fact as to whether Lewellen fabricated evidence or withheld *Brady* materials *after* the arrest. *See, Gauger v. Hendle,* 352 Ill. Dec. 447, 469 (App. Ct. 2011) ("The existence of probable cause in a malicious-prosecution action is determined by looking to what the defendants knew at the time of subscribing a criminal complaint [or continued prosecution] and not at the (earlier) time of arrest."). Viewed in the light most favorable to the Plaintiff, Lewellen "engineered plaintiff's prosecution" and

prevented the prosecuting attorney from exercising "independent discretion to proceed with charges and the prosecution." *See, Kim v. City of Chi.,* 368 Ill. App. 3d 648, 660 (2006) (affirming summary judgment where the defendants did not do those things). Moreover, Lewellen may be liable for maliciously prosecuting Plaintiff even if Plaintiff had, in fact, possessed cocaine. This is because in the context of a malicious prosecution case, "[i]t is the state of mind of the person commencing the prosecution that is at issue – not the actual facts of the case or the guilt or innocence of the accused." *Id.* at 574. In sum, Lewellen cannot make out that as a matter of law he had probable cause to prosecute Plaintiff. The Court therefore denies Lewellen summary judgment on Count III.

## I. *Monell* **Claim against the City of Chicago**

A municipality like the City cannot be held liable under § 1983 unless a plaintiff establishes that his constitutional injury was caused by a municipal "policy". *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690-91 (1978). Two distinct requirements thus underlie a *Monell* claim: (1) the existence of a municipal "policy" and (2) a direct causal link from the policy to a plaintiff's particular constitutional injury. *See, Bd. of the Cty. Comm'Rs of Bryant County v. Brown,* 520 U.S. 397, 403-04 (1997) and *Okla. City v. Tuttle,* 471 U.S. 808, 829 n.3 (1985) (Brennan, J., concurring).

A municipal "policy" under *Monell* may come in one of three forms: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with 'final policymaking authority.'" *McTigue v. City of Chi.*, 60 F.3d 381, 382 (7th Cir. 1995). Plaintiff argues that there are two "policies" in this case that justify imposing *Monell* liability on the City: the CPD's practice of paying informants who continue to commit crimes and the CPD's failure to properly discipline its police officers.

### 1. *Paying Informants who Engage in Illicit Activities*

Plaintiff and the City tussle over whether the CPD's payments to Rodriguez constitute a municipal "policy" of paying informants even while they commit crimes. The Court is of the view that even if Plaintiff could make out a colorable a municipal "policy," his *Monell* claim would still fail for lack of causation linking the policy to his injury.

A plaintiff bringing a § 1983 action must establish both but-for and proximate causation in linking the challenged action to his constitutional deprivation. *See, e.g., Jones,* 856 F.2d at 993 ("[P]rinciples of legal causation [] are as applicable to

constitutional torts as to common law torts."). The constitutional injury Plaintiff complains of in this case is that Lewellen framed him. The identity of the tortfeasor is important because although Plaintiff spends pages of his briefs detailing Rodriguez's wide-ranging criminal activities, Plaintiff is not bringing this lawsuit against Rodriguez but against Lewellen, and through Lewellen by means of a City's policy having operation of law, against the City. *See, Monell,* 436 U.S. at 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). Plaintiff must thus establish the requisite nexus between the CPD's policy of paying Rodriguez to Plaintiff being framed by Lewellen.

This means that Plaintiff must show that the CPD's payments to Rodriguez, in spite of his criminal activities, were the "direct cause" or "moving force" behind Lewellen framing Plaintiff. *See, e.g., Woodward v. Corr. Med. Servs. of Ill., Inc.,* 368 F.3d 917, 927 (7th Cir. 2004). At the least, this means that Plaintiff must show that but for the CPD's payments to Rodriguez, Lewellen would not have framed Plaintiff. This

requires making a showing along the lines that had the City not paid Rodriguez as an informant, Rodriguez would not have engaged in criminal activities. In particular, he would not have engaged in criminal activities with a police officer, thereby giving that officer a reason to frame somebody so as to divert attention away from the pair's criminal activities. Plaintiff has not brought any evidence to support this chain of causation.

To the contrary, the record shows that Lewellen and Rodriguez had opportunity and motive to engage in criminal acts that had little to do with the CPD's informant policy. Lewellen registered Rodriguez as a CI, indicating that he interacted with Rodriguez before Rodriguez ever became an informant or collected a single payment from the CPD. Further, Lewellen and Rodriguez's criminal enterprise was rather lucrative, as suggested by Lewellen having to pay over $6 million in forfeiture as a result of his criminal conviction. That the duo would not have engaged in illicit money-making activities but for the CPD's payments to Rodriguez is both implausible and not supported by any evidence.

Put differently, Plaintiff has to show that a police officer engaging in criminal activities and framing somebody to hide those crimes must have been a consequence so "known" or "obvious" at the moment when CPD policymakers chose to institute its policy regarding informants that the CPD can be said to have

been "deliberately indifferent" to those consequences. *See, e.g., Bryant County,* 520 U.S. 397 at 407 (1997). That the underlying "policy" here is one governing the use of informants, and not anything to do with police officers directly, makes the consequences of police officers' wrongdoing less than obvious.

Insofar as Plaintiff addresses the issue of causation, he takes the stand that any "reference to Defendant Lewellen in this particular argument is a red herring." (ECF No. 273 (Pl.'s Reply to City) at 2.) According to Plaintiff, "[t]he corruption of Lewellen was another consequence of the City's practice and custom" but irrelevant to Plaintiff's claim against the City. This is puzzling given that the underlying constitutional harm Plaintiff complains of was inflicted by Lewellen.

In short, the Court agrees with the City that Plaintiff fails to show causation or deliberate indifference to the extent that he relies on the City's practice of paying informants to make out a *Monell* claim. As to Plaintiff's allegation that the CPD protected Rodriguez from criminal prosecution, it is unclear whether this is a claim that the CPD also had a "policy" of protecting lawless informants (as opposed to simply paying them) or merely brought as evidence that the CPD knew that Rodriguez was breaking the law. In either case, the evidence, even when viewed in the light most favorable to Plaintiff, does not raise

an inference that anyone at the CPD besides Lewellen protected Rodriguez.

In his deposition, DEA Agent Doescher ("Doescher") could not say that anybody else from the CPD besides Lewellen contacted him, or anybody else at the DEA, about dropping the investigation against Rodriguez. In addition, the letter from Assistant U.S. Attorney McDuffie to Doescher, even when considered despite being hearsay, only repeats back to Doescher actions that Doescher's employer, the DEA, had taken. The two sentences from the letter that mentions the CPD read:

> You have indicated that the Drug Enforcement Agency ("DEA") has determined that a target of a DEA investigation initiated in May, 1996, is a cooperating individual ("CI") working with detectives of the Chicago Police Department, and that the DEA has, therefore, discontinued its investigation.

> Also, I understand that the DEA has advised the Chicago Department of the approximately 154.6 pounds of marijuana that the DEA seized on June 19, 1996, and that the Chicago Police Department has expressed no interest in obtaining those narcotics.

(ECF No. 237, Ex. L.) McDuffie's letter does not suggest that USAO had any contact with the CPD that was not filtered through the DEA. McDuffie is thus even further removed from the CPD than Doescher, and Doescher, as discussed, does not have anything to offer other than that Lewellen called him about Rodriguez. When Plaintiff's expert opined that "it is impossible to believe that a call from a police officer or Sergeant would be sufficient to accomplish this amazing task [of

discontinuing a DEA investigation]," the opinion is by *ipse dixit* of the expert since he cited to no source other than "my experience and knowledge of the criminal justice system" to support his disbelief. (Stine's Rep. at 11.) The Court cannot credit such an opinion. *See, e.g., GE v. Joiner,* 522 U.S. 136, 146 (1997) and *Zenith Elecs. Corp. v. WH-TV Broad. Corp.,* 395 F.3d 416, 419 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert . . .").

Likewise, Plaintiff has brought no evidence that the reason Rodriguez's gun charge was nonsuited was due to interference by the CPD. Finally, Plaintiff's charges of police wrongdoing are confined to Lewellen's actions, *e.g.,* Lewellen telling Rodriguez to keep dealing drugs, Lewellen promising Rodriguez protection, and Lewellen giving Rodriguez cocaine. They do not relate to any "policy" of the City as required for *Monell* liability.

The Court grants the City summary judgment on this part of the claim and as necessary, denies Plaintiff's summary judgment motion.

### 2. Failing to Discipline Police Officers

The more obvious connection between the CPD and Plaintiff's injury is that the CPD employed Lewellen, the officer who (arguably) framed Plaintiff. Thus, Plaintiff's cleanest theory of liability is that the CPD should have prevented, stopped, or

discovered sooner Lewellen's framing of Plaintiff. Although the City cannot be held responsible on a *respondeat superior* theory, Plaintiff may still be able to make out a municipal policy on the basis of the City's failure to train, monitor, or discipline its police officers. *See, e.g., Okla. City v. Tuttle,* 471 U.S. 808, 812-13, 820 (1985) (alleging that a failure to "adequately supervise, train, review, and discipline the police officers constitutes deliberate indifference to the constitutional rights of the decedent"). Accordingly, a failure to discipline police officers – not anything to do with informants – is Plaintiff's second alleged *Monell* policy.

At the outset, the Court must agree with the City that Plaintiff muddles the *Monell* basis on which he purports to establish his claim. As far as the Court can tell from Plaintiff's own Motion for Summary Judgment, his opposition briefs to City's Motion, and his expert report, Plaintiff seems to characterize the City's lack of discipline as either a "custom" with the force of law or an official act by a policymaker with final authority over discipline, here identified as CPD Superintendent Terry Hillard.

Of the two theories, the policymaker claim must fail because Plaintiff has not carried his burden to show that Hillard was indeed the person with final policymaking authority over police discipline. Plaintiff did not even mention

Hillard's name until his response brief to the City's Motion for Summary Judgment. Once he did identify Hillard, the only evidentiary support Plaintiff brings to show that Hillard was the relevant policymaker is the City's Statement of Facts. The City, however, only stated that "The Superintendent of Police is the final policymaker for policies related to the use of cooperating individuals during the period 1995 to 2000." (ECF No. 244 ¶ 31.)

Just because Hillard was the final policymaker for policies related to informants does not make him the final policymaker for policies related to discipline. *See, e.g., Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy *with respect to the action ordered*.") (emphasis added) and *Valentino v. Vill. of S. Chi. Heights,* 575 F.3d 664, 676 (7th Cir. 2009) (stating that the relevant inquiry is whether an official is a policymaker "in a particular area" "on a particular issue") (internal quotation marks omitted). The City's admission that Hillard is a policymaker in one particular area falls short of establishing that he is the relevant policy maker on a different area.

Stated differently, Plaintiff has not met his burden under the law to prove that an official is the relevant policymaker. He has not pointed to any state law establishing that the

Superintendent has the responsibility for setting policies regarding police discipline. *See, e.g., Auriemma v. Rice,* 957 F.2d 397, 400 (7th Cir. 1992) (directing litigants to look to state or local law to determine whether an official has "the responsibility for making law or setting policy in any given area of a local government's business") (quoting *St. Louis v. Praprotnik,* 485 U.S. 112, 125 (1988)). Neither has he established facts tending to prove that Hillard's disciplinary decisions are unconstrained, not subject to meaningful review, or within the grant of his authority. *See, Valentino,* 575 F.3d at 676 (listing these as the factors that should be consulted in determining whether an official is a final decision maker in a particular area).

Because the Court rejects Plaintiff's policymaker theory with respect to his discipline claim, it also discounts any reliance Plaintiff places on the 1997 report by the Commission on Police Integrity (the "Webb Report"). To the extent that the Court is able to place the report (and similar materials) within a context relevant to Plaintiff's *Monell* argument, it gathers that the report was used to establish that the CPD's inadequate discipline was "a deliberate choice to follow a course of action [] made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur,* 475 U.S. at 483.

According to Plaintiff, the Webb Report's "most emphatic recommendation" was for the City to implement an early warning system to detect patterns of police misconduct. (ECF No. 260 (Pl.'s Resp. to City) at 10.) The City thus had a choice between at least two alternatives, one of which was to implement such a system, and it deliberately chose to do so.

However, without an identification of the "official or officials responsible for establishing final policy with respect" to discipline generally and the implementation of such systems more narrowly, the report does not help Plaintiff. The City, through its own expert opinion, also points out that many of the recommendations from the Webb Report "could not be unilaterally imposed by management and w[ere] only implemented after an arbitration opinion and award between the City and the FOP (police union)." (ECF 244, Ex. 26 (Noble's Rep.) ¶ 94.) Constraints imposed by collective bargaining agreements call into question whether the Superintendent of the CPD was the policymaker with final authority for establishing disciplinary regulations. *See, e.g., Auriemma,* 957 F.2d at 401 (noting that where the Superintendent has no power to effect an action, the City cannot be faulted when he takes (or fails to take) the action).

Alternatively, Plaintiff argues that the lack of discipline at the CPD was so widespread as to constitute a "custom" having

force of law.   Plaintiff's support for this theory comes primarily from Stine's expert opinion.   The bottom line of Stine's opinion is that "there is an organizational culture within the Chicago Police Department that . . . prevented the City and the CPD from identifying and disciplining CPD members when they abuse members of the public."  (Stine's Rep. at 50-51.)   Ultimately, "these failures emboldened individual police officers of the CPD, like Officers Lewellen, [and] Sanchez" whose "actions could only have occurred in an organization where this culture had been adopted."  *Id.* at 51.  In coming to these conclusions, Stine relies on two primary sources:  the overall rate of sustained complaints against Chicago police officers and a review of 41 complaints (called CRs) that "relate to the named officer and unit."  *Id.* at 17.  The Court finds both insufficient to support Stine's conclusion.

First, Stine's reliance on the overall rate of sustained complaints is unwarranted.  Stine calculated the sustained rate from these numbers:  "from 2001 to 2006 . . . 10,733 complaints were filed against [Chicago police officers] . . . by the public [and] 236 were sustained."  (Stine's Rep. at 19.)  This computes to a two percent rate.  Stine calls this sustained rate "low" and states that the "low sustained rate" meant that police officers "escaped detection and/or punishment."  *Id.*  This, in turn, "sent a powerful message to . . . officers like Officers

Lewellen, [and] Sanchez . . . that the police are free to continually violate the rights of the citizens." *Id.* at 19-20.

The Court finds Stine's conclusion untenable for several reasons. First, the Seventh Circuit has previously rejected the contention that a particular sustained rate "must give rise to a reasonable man's suspicions that defendant Chicago's methods of review are weighted to discourage positive findings." *See, Strauss v. City of Chi.,* 760 F.2d 765, 768-69 (7th Cir. 1985). *See also, Frake v. City of Chi.,* 210 F.3d 779, 782 (7th Cir. 2000) ("We do not think that numbers can tell the whole story."). Second, Stine has offered no benchmark against which to compare the CPD's 2% number and thus no basis for concluding that this number is too "low" or should be higher were the CPD properly disciplining its police officers. (In fact, a higher sustained rate might imply that the CPD was violating its citizens' constitutional rights on a more frequent basis and hence that the CPD had a more problematic organizational culture.) Last, the 2% rate was computed using 2001-2006 data when Plaintiff's injury arose in 1999. This misalignment of data used and conclusion drawn, without any explanation as to why these years were selected, makes even more tenuous the link required "between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir.

2003). *See also, Butera v. Cottey,* 285 F.3d 601, 608 n.3 (7th Cir. 2002) (finding of little value an earlier decision partly because the earlier decision examined "conditions as they existed in 1999, nearly two years after" the plaintiff's injury). In sum, "there is simply too great an analytical gap between the data and the opinion proffered" for the Court to accept Stine's opinion on this point. *GE,* 522 U.S. at 146.

As for the 41 CR files, Plaintiff's expert characterized them as "relat[ing] to the named officer and unit" but did not specify which named officers and units these were. (Stine's Rep. at 17.) Elsewhere, the expert confusingly described the 41 files as not being a targeted review but a random sample. *Id.* at 20. The City's expert, on the other hand, disputes that the files were a random sample. (ECF No. 244, Ex. 26 (Noble's Rep.) 30.) As best as the Court can tell, Plaintiff may have done a stratified random sample to come up with the 41 CRs; that is, he narrowed the population of complaint files to those made against only certain officers (which ones?) and units (again which?), and from this narrowed universe, randomly drew complaints to come up with the 41 files he actually reviewed. However, this is all guesswork by the Court as Plaintiff has not explained his methodology to any satisfactory level of detail. Plaintiff also has not explained how he came to the conclusion that 41 files are a sufficient number to reach a reliable conclusion about the

CPD's disciplinary practices. Absent any such explanation, the Court is not convinced that Stine's "methodology underlying the testimony is scientifically valid" and thus cannot allow his opinion to be the key to get Plaintiff through the gate to trial. *See, Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591-93 (1993). The City's Motion for Summary Judgment is granted. Plaintiff's, by necessity, is denied.

### IV.   CONCLUSION

For the reasons stated herein, the Court rules as follows:

1.   Sanchez's Motion for Summary Judgment is granted;

2.   Lewellen's Motion for Summary Judgment is denied with respect to Count I and Count III and granted with respect to Count II;

3.   The City of Chicago's Motion for Summary Judgment is granted; and

4.   Plaintiff's Motion for Partial Summary Judgment against Lewellen and the City of Chicago is denied.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: October 26, 2016

- 73 -