IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

REFUGIO RUIZ-CORTEZ,

                    Plaintiff,

          v.                                Case No. 11 C 1420

GLENN LEWELLEN,                        Judge Harry D. Leinenweber

                    Defendant.

## MEMORANDUM OPINION AND ORDER

For the reasons stated herein, Plaintiff Refugio Ruiz-Cortez's Motion for Judgment as a Matter of Law [ECF No. 357] is granted in part and denied in part. The Court grants the Motion insofar as it finds that Defendant Glenn Lewellen's ("Lewellen") criminal conviction establishes as a matter of law that Lewellen withheld impeaching *Brady* materials. It denies the Motion as to the claim that Lewellen violated Plaintiff's due process rights by fabricating evidence. Pursuant to Federal Rule of Civil Procedure 50(c)(1), the Court further rules that it conditionally denies a new trial.

## I.  BACKGROUND

Plaintiff Ruiz-Cortez's week-long trial went against him when the jury found former Chicago Police Officer Glenn Lewellen not liable for violating Plaintiff's constitutional rights. Lewellen

was the sole remaining Defendant in the case after the Court granted summary judgment in favor of the other police officers and the City of Chicago. *See generally, Ruiz-Cortez v. City of Chi.,* No. 11 C 1420, 2016 U.S. Dist. LEXIS 148063 (N.D. Ill. Oct. 26, 2016). In contrast, the Court denied both Plaintiff's and Lewellen's Motions for Summary Judgment. *See, id.* at *79. The case against Lewellen thus proceeded to trial.

On the eve of trial, the Court issued a written ruling on the parties' Motions *in Limine*. *See,* ECF No. 336 (Order Disposing of *In Limine* Motions). With the exception of one ruling on the issue of Plaintiff's income taxes, the Court stood by its *in limine* decisions and their reasoning as the proceeding unfolded.

At trial, Plaintiff argued that Lewellen denied him due process in at least one of two ways. First, Plaintiff contended that Lewellen fabricated evidence during the course of Plaintiff's criminal prosecution. Second, he alleged that Lewellen withheld exculpatory impeachment evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). Plaintiff asked to be compensated for the eleven years he spent in prison following his conviction for cocaine possession with intent to distribute, a conviction obtained as a result of Lewellen's allegedly unconstitutional conduct.

To claim damages, Plaintiff built a case in which Lewellen was a dirty cop who "framed" Plaintiff. The parties did not dispute that about a decade after he testified to observing Ruiz-Cortez carrying a bag containing cocaine, Lewellen himself was convicted of conspiracy to possess with intent to distribute. The parties also did not dispute that the jury at Lewellen's criminal trial was deadlocked on the charge containing the allegation that Lewellen provided false testimony at Ruiz-Cortez's trial in 1999. Indeed, Plaintiff and Defendant stipulated to these facts, and the Court instructed the jury that it should accept them as true. *See*, ECF Nos. 349-353 (Trial Tr.) at 853:17-856:1 (taking judicial notice that "Lewellen was not convicted of the racketeering count containing the predicate obstruction of justice premised upon Lewellen's alleged perjury during plaintiff's 1999 criminal trial" but that he "was convicted of felony conspiracy to possess with intent [to] distribute cocaine on June 4th, 2013, and sentenced to 18 years"); ECF No. 348 (Jury Instructions) (instructing the jury that "If I have taken judicial notice of certain facts, you must accept those facts as proved").

While the parties did not dispute Lewellen's conviction, they hotly contested the events leading to Plaintiff's arrest. During this trial (but not his criminal trial), Plaintiff admitted that he stored the cocaine for which he was prosecuted and found

guilty.  Plaintiff maintained, however, that he only did so because he was coerced.  Plaintiff also maintained that he did not carry a bag of cocaine from his apartment to the parking lot of the building in the minutes before Lewellen and his partner came to Plaintiff's door to arrest him.  According to Plaintiff, Lewellen fabricated evidence – or lied – when he testified that he saw Plaintiff carry the bag of cocaine. Plaintiff read to the jury this allegedly false testimony when Lewellen invoked his Fifth Amendment right not to answer questions in this case.

Plaintiff's own testimony is the only evidence he presented to the jury that he was coerced.  According to Plaintiff, an individual named Carlos Rodriguez or "Changa" threatened his family.  *See,* Trial Tr. at 516:2-528:18 (testifying that after Plaintiff told Carlos or Changa that he was "not going to help [him] with anything," Changa responded with "You know what, think about you.  Actually, think about your family.  Think about me"). Out of fear and a desire to protect his family, Plaintiff agreed to keep Changa's cocaine at his apartment, effectively turning the place into a drug distribution station. *See, id.* at 525:4-526:2 ("They leave me with no other choice. They threatened me.  They threatened my child.  They threatened my family."); 527:13-529:5 ("I had to do it and not for me, but for her [Claudia, Plaintiff's then-pregnant girlfriend], for all the people I love.").

Unsurprisingly, Plaintiff was repeatedly impeached when he took the stand to tell this story. *See,* Trial Tr. at 547:25-550:4; 556:4-569:22; 571:11-574:9; 587:24-591:19 (impeachment with the fact that Plaintiff lied during his criminal trial, telling the judge and jurors then that he had no drugs in his apartment) ("Q: When you were testifying, you looked at a whole different set of jurors in this very courthouse while you were testifying, right? A: Yes. Q: And you lied to their faces? A: Yes.") ("Q: You didn't have to say anything to the judge either, just like you didn't have to say anything to the jury, correct? A: Yes. Q: You decided that you were going to open your mouth and lie? A: Yes."); 552:13-554:15 (impeachment with Plaintiff's use of false names); 597:1-607:10 (impeachment with Plaintiff's earlier complaints in the case, which did not allege that he was coerced into holding drugs); 618:18-624:4 (impeachment with Plaintiff's deposition testimony); 629:12-644:14 (impeachment by implausibility that Changa importuned Plaintiff to store drugs time and again after Plaintiff repeatedly turned him down); 650:19-655:7 (impeachment by contradiction Plaintiff's story that Changa threatened him) ("Q: After she's [Claudia] been threatened specifically, you've been threatened specifically, you have about 200 pounds of dope in your house, you go to work all day and just leave your pregnant wife there alone during the day. Is that what

- 5 -

your testimony is?  A:  That's where she would stay.  Q:  Ah, I see.  And not only would she stay there, in June and July of 1999, she'd watch your little baby nieces and nephews there, too, wouldn't she? . . .  Q:  So Claudia did continue to watch your baby nieces and nephews when there's 200 pounds of dope in your house after they've been threatened, right?  A:  Yes.") ("Q: After the drugs were dropped off in those – in that couple-of-week period, you do not go to the police?  A: No."); 663:4-668:21 (impeachment with the fact that after his arrest, Plaintiff floated the idea of giving the police information in exchange for a deal) ("Q:  If you could have gotten a break, you would have given the names of these people to the police, right?  A:  I cannot say yes, and I cannot say no . . ."); 671:21-677:3 (impeachment with the fact that Plaintiff told law enforcement a different story than that he was coerced into storing drugs when they came to question him immediately before his release from prison) ("Q:  And you told them that Primo explained that you would be paid to hide the cocaine and give the cocaine to people that arrived at the house? . . .  A:  I don't recall that very well.").

As to the events that took place immediately before his arrest, Plaintiff offered, in addition to his own words, the testimony of one Lisette Venegas ("Venegas").  Venegas was the

drug courier who Plaintiff said actually carried the drugs from Plaintiff's apartment to the parking lot. With some inconsistencies, Venegas corroborated this story. She testified that she took the bag of cocaine from Plaintiff, carried it to her car, and put the bag in the trunk. Before she could leave, however, a man – whom she at Plaintiff's trial identified as Lewellen – stopped her, took the bag of drugs, and let her go. *See,* Trial Tr. at 188:1-191:9. Venegas, too, was impeached at length during cross-examination. *See, id.* at 197:3-201:22 (impeachment with the fact that Venegas lied to the Government about her dealings with Lewellen's co-conspirator); 233:5-244:13 (highlighting the inconsistencies between Plaintiff's and Venegas's testimonies about what happened on the day of Plaintiff's arrest); 248:13-253:13 (drawing doubt to the testimony that Lewellen stopped Venegas as she was leaving Plaintiff's apartment).

Finally, Plaintiff read to the jury the testimony of a Saul Rodriguez ("Rodriguez"). *See,* Trial Tr. 59:10-118:5. Rodriguez was Lewellen's co-conspirator, and he testified against Lewellen at the latter's criminal trial pursuant to a deal he had with the Government. At this trial, Rodriguez invoked his Fifth Amendment right against self-incrimination and refused to testify, leaving Plaintiff to read in his testimony as offered at Lewellen's

criminal trial. In that testimony, Rodriguez recounted the various bad acts that Rodriguez said he and Lewellen committed together, *e.g.,* robberies of drug dealers, planting of cocaine. Rebuttal of Rodriguez's testimony in the form of his cross-examination from the criminal trial was also read to the jury. *See, id.* at 118:22-146:7.

As relevant to Ruiz-Cortez's arrest, Rodriguez testified that he told Lewellen that he was sending a courier to pick up cocaine "from one of Changa's supplier's worker[s]," or Venegas to pick up drugs from Ruiz-Cortez, as it turned out. *See,* Trial Tr. at 95:16-18. Rodriguez also provided a tip that led law enforcement to begin surveilling Ruiz-Cortez's apartment. Rodriguez expected that if Lewellen or other officers seized money or drugs as a result of the information he provided, he would get paid as a confidential informant and Venegas, a woman Lewellen knew from before, would be let go. For his part in the conspiracy and other crimes, Rodriguez is now serving a term of imprisonment of 40 years. *See, United States v. Rodriguez,* 09-CR-332, ECF No. 1534 (N.D. Ill. May 6, 2015).

In sum then, Plaintiff's strategy at trial was to convince the jury that he stored drugs only to protect his family. Plaintiff also sought to convince the jury that Lewellen fabricated evidence and hid the fact that he was committing

illicit acts with Rodriguez. Predictably, the defense strategy was to poke holes in this story, especially Plaintiff's claim that he was coerced into, and not paid for, holding drugs. It accomplished this by impeaching Plaintiff and his witnesses and by putting on the testimonies of various law enforcement personnel involved in Ruiz-Cortez's arrest, questioning, and prosecution.

At the close of the parties' evidence, the Court gave a set of jury instructions. Among other things, the Court told the jury what is and is not evidence and instructed it to decide the case on the evidence presented alone. *See,* ECF No. 348. Given that both Rodriguez and Lewellen invoked the Fifth Amendment, the Court also instructed the jury on the inference it may draw from such silence. *Id.* The jury then returned a verdict against Plaintiff, finding Defendant Lewellen not liable.

Unhappy with the verdict, Plaintiff filed this Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial. For the reasons stated below, the Court grants the Motion in part and denies it in part.

## II. <u>ANALYSIS</u>

Plaintiff argues that he is entitled to judgment as a matter of law because he introduced "substantial, [and] unrebutted" testimony establishing both Lewellen's fabrication of evidence and his withholding of *Brady* materials. Alternatively, he says that

the Court committed errors in its evidentiary rulings that justify a new trial. The Court takes these arguments seriatim below.

## A. Judgment as a Matter of Law

In considering Plaintiff's Rule 50 Motion for Judgment as a Matter of Law, the Court views the facts in the light most favorable to Lewellen as the nonmovant and asks whether the evidence presented, combined with all reasonable inferences drawn therefrom, is sufficient to support the verdict he won. *See,* FED. R. CIV. P. 50(a)(1); *Erickson v. Wis. Dep't of Corr.,* 469 F.3d 600, 601 (7th Cir. 2006). Only if it finds that the evidence is legally insufficient may the Court direct judgment for Plaintiff.

The Court's inquiry requires it to review the record as a whole while keeping in mind two important principles. *See, Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150-51 (2000); *Harvey v. Office of Banks & Real Estate,* 377 F.3d 698, 707 (7th Cir. 2004). First, in reviewing the record, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves,* 530 U.S. at 151. Second, it "should give credence to . . . evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (internal quotation marks omitted).

The Court concludes that all evidence besides Lewellen's criminal conviction for conspiracy to possess and distribute cocaine is evidence that "the jury is not required to believe." Lewellen's criminal conviction, on the other hand, is "uncontradicted and unimpeached" evidence. Accordingly, Plaintiff's Motion for Judgment as a Matter of Law on his claim that Lewellen violated his due process rights by fabricating evidence must be denied. However, his claim that Lewellen withheld impeaching *Brady* evidence, insofar as that evidence consists of Lewellen's participation in the narcotics conspiracy, is granted.

### 1. *Fabrication of Inculpatory Evidence*

Plaintiff insists that Lewellen must have lied about the events on the day of Plaintiff's arrest because Plaintiff's testimony, and those of Venegas and Rodriguez, established what actually happened that day. The Court disagrees.

As shown by the verdict, the jury did not believe Plaintiff and his witnesses. The record is replete with evidence supporting the jury's decision to do so. Jurors saw how both Plaintiff and Venegas were repeatedly impeached during their cross examination. They observed the defense not only calling these witnesses' general credibility into question but also impugning their specific accounts as to what happened. In particular, the defense

highlighted the multiple instances in which Plaintiff's and Venegas's stories diverged. For example, while Plaintiff made much of the fact that he did not arrive home until late afternoon (to cast doubt on Lewellen's timeline of events), Venegas testified that she arrived at Plaintiff's apartment and saw him during in the morning, possibly before noon. *Compare,* Trial Tr. at 531:7-8 *with* 225:10-227:16. Once Venegas arrived (at whatever time), Plaintiff said that she went into his apartment, spent 15-20 minutes there bagging the drugs herself, and left with the bag unaccompanied by Plaintiff. *See, id.* at 532:2-533:4, 655:14-657:23. In contrast, Venegas said that she never entered Plaintiff's apartment, that Plaintiff had already bagged the drugs for her when she arrived, and that he handed her the bag of cocaine directly from the doorway of his apartment. *See, id.* at 237:20-244:13. Venegas further contradicted Plaintiff on his assertion that Lewellen could not have seen him handling a bag of cocaine, testifying that Plaintiff stood in the doorway when he handed her the bag of drugs and could be seen from the outside doing so. *See, id.* at 234:7-235:6.

Plainly, neither Plaintiff nor Venegas offered "uncontradicted" or "unimpeached" testimony, and the jury was not required to believe them. *See, Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1045 (7th Cir. 1999) (holding that when the problems with a

party's version of what happened were "serious enough," "a rational jury might have disbelieved" that party); *Myvett v. Heerdt,* No. 12 CV 09464, 2017 U.S. Dist. LEXIS 2628, at *45-46 (N.D. Ill. Jan. 9, 2017) ("[T]he defense witnesses, and the defendants in particular, were thoroughly and repeatedly impeached with prior inconsistent statements and omissions from their reports, prior testimony, and discovery responses. . . . [T]he inconsistencies were such that the jury could have reasonably rejected the version of events the officers provided at trial altogether."). Any favorable evidence they provided to Plaintiff's claim must be disregarded. *See, Reeves,* 530 U.S. at 151.

As for Rodriguez, he was not present at the scene and so did not provide any testimony to contradict what Lewellen said happened before he arrested Plaintiff. Although Rodriguez testified that he expected that Lewellen would let Venegas go because he knew her to be Rodriguez's courier, the jury was not required to believe that this was indeed what happened. None of what Rodriguez said about the anticipated interaction between Venegas and Lewellen was necessary to convict Lewellen of conspiracy to distribute cocaine, the only charge on which he was found guilty. Since things outside that conviction are subject to various contradictory accounts, the jury was entitled to draw its

own conclusion on such matters, including whether Lewellen deliberately let Venegas go and then lied about it at Ruiz-Cortez's trial.

Not only was the jury not required to believe Rodriguez, it had reasonable grounds to disbelieve him. First, as a convicted murderer who testified pursuant to a deal with the Government, Rodriguez was neither a disinterested party nor somebody without credibility issues. Second, Rodriguez's prior testimony, read in at this trial, was contradicted and impeached when it was given. Third, the testimony had to be read in because Rodriguez refused to testify, choosing instead to invoke his Fifth Amendment rights, and the jury may reasonably make an adverse inference from his silence. *See, United States SEC v. Lyttle,* 538 F.3d 601, 604 (7th Cir. 2008); *Hillmann v. City of Chi.,* 834 F.3d 787, 793 (7th Cir. 2016) (collecting cases). In short, the jury was at liberty to discount Rodriguez's testimony.

Perhaps realizing the credibility issues presented by his witnesses and himself, Plaintiff here seeks to bolster his account of what happened by invoking the authority of the United States. "The United States," wrote Plaintiff, "after deploying its vast investigative resources, concluded that Ms. Venegas, not Mr. Ruiz, had the cocaine in the parking lot." ECF No. 357 at 15. As such, "the United States . . . charge[d] Lewellen with obstructing

justice for arresting Mr. Ruiz." *Id.* But the United States did
not manage to convict Lewellen on this count, a fact known to the
jury in this trial. The jury thus knew that Lewellen's criminal
trial yielded no answer to the question of who carried the cocaine
in the parking lot. As such, it was entitled to judge the facts
for itself. Simply because it came to a different conclusion than
the federal prosecutors who charged Lewellen is no reason to
overturn its verdict. *See, Massey v. Blue Cross-Blue Shield,* 226
F.3d 922, 925 (7th Cir. 2000) ("[T]he jury is the body best
equipped to judge the facts, weigh the evidence, determine
credibility, and use its common sense to arrive at a reasoned
decision.") (internal quotation and alteration marks omitted).

Plaintiff also made much of the fact that Lewellen was the
only witness who testified at Ruiz-Cortez's criminal trial that he
saw him with a bag of cocaine in the apartment parking lot. But
uncorroborated testimony is not necessarily false testimony. The
jury might rationally have disbelieved Lewellen (that Plaintiff
carried a bag of cocaine) and believed Plaintiff (that he did
not), but it chose to believe Lewellen and disbelieve Plaintiff.
The Court cannot say that this was unreasonable as a matter of
law. *See, Massey,* 226 F.3d at 924 ("Especially after a jury has
evaluated a case, we bear in mind that the question is not whether
the jury believed the right people, but only whether it was

presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict."); *Sheehan,* 173 F.3d at 1043-44 (finding that when "the jury might rationally have believed [one party's story], but it did believe [the other party]," "[t]here was a reasonable basis in the record for that verdict" in favor of the party whom the jury believed) (internal quotation and alteration marks omitted).

Put differently, since even a dirty cop may sometimes tell the truth, the jury may reasonably have believed that Lewellen told the truth as to what happened in the parking lot that day. The issue boils down to one of credibility, something on which the Court "will not second-guess a jury." *See, Harvey,* 377 F.3d at 712 ("In reviewing a Rule 50 motion, we will not second-guess a jury on credibility issues."); *Payne v. Milwaukee Cty.,* 146 F.3d 430, 433 (7th Cir. 1998) ("When a case turns on credibility, neither side is entitled to judgment as a matter of law unless objective evidence shows that it would be unreasonable to believe a critical witness for one side.") (internal quotation marks omitted).

Alternatively, the jury may simply have thought that Plaintiff, who carried the burden of proof, did not show that Lewellen lied. After all, Lewellen's testimony was contradicted only by Plaintiff's own impeached account and that of somebody

equally compromised (Venegas).  Plaintiff and Venegas were even impeached by each other's versions of events.  Their conflicting testimonies may have left jurors unable to discern whether Lewellen lied.  In such a case, a no-liability verdict was proper. Put differently, just as the jury was free to believe one side over another in the face of conflicting or inconsistent testimony, *see, Thomas v. Cook Cty. Sheriff's Dep't.*, 604 F.3d 293, 302 (7th Cir. 2009), it may have disbelieved both sides and so found against the party who bears the burden of proof.

It is true that Lewellen stood by his Fifth Amendment right to remain silent in this case.  However, as a negative inference from such silence is permitted but not required, *see, Evans v. City of Chi.,* 513 F.3d 735, 741 (7th Cir. 2008), the jury was entitled to treat that silence how they wished.  Furthermore, while Lewellen did not testify, he did call various individuals involved with law enforcement to testify on his behalf.  These individuals opined that Lewellen and his partner's surveillance and apprehension of Plaintiff were within the operating procedures of the Chicago Police Department and so provided general support for Lewellen's testimony as to what happened.  As such, the jury had an affirmative basis for believing Lewellen.

Although Plaintiff does not bring up the issue, the Court is aware that when the Government moved to vacate Ruiz-Cortez's

sentence and release him from prison, it was of the opinion that "no reasonable fact-finder would have found the defendant guilty." *See, United States v. Ruiz,* 99-CR-493, ECF No. 50 (N.D. Ill. May 31, 2010). However, even if the Government was correct in that assessment, its opinion is not dispositive for the current motion. If, for instance, Lewellen is as believable as not, then no reasonable fact-finder would convict Plaintiff (because the Government cannot show that Lewellen's testimony proved beyond a reasonable doubt that Ruiz-Cortez was guilty), but no reasonable fact-finder would find for Plaintiff on his fabrication claim either (because Plaintiff cannot carry his burden to show by a preponderance of the evidence that Lewellen lied). In other words, since "the differences between civil and criminal litigation all favor the criminal defendant," *Am. Family Mut. Ins. Co. v. Savickas,* 193 Ill. 2d 378, 385 (2000), Ruiz-Cortez may escape a guilty verdict in the criminal trial and yet not be able to prove that Lewellen lied about the evidence that would have been used to convict him. This is what happened here, and the law does not compel a different result.

To summarize, nothing that Plaintiff said obligated a reasonable jury to believe that his version about what happened is true and, by inference, Lewellen's false. The verdict, not having been shown to be unreasonable, stands. *See, Erickson,* 469 F.3d at

601 ("We will overturn the verdict only if no reasonable jury could have found in [the nonmovant's] favor."). Judgment on the fabrication claim is denied.

### 2. *Withholding of* Brady *Evidence*

Plaintiff is on firmer ground when he argues that Lewellen "withheld evidence of his participation in a narcotics conspiracy from Plaintiff" during his criminal prosecution and so violated his *Brady* rights. ECF No. 357 at 2. The parties agreed that Lewellen was convicted of conspiracy to possess and distribute cocaine. They must also agree that Lewellen did not reveal his involvement in such a conspiracy to Ruiz-Cortez at any time before Ruiz-Cortez's criminal trial in 1999. The only remaining question is whether the nondisclosure of this involvement is a *Brady* violation.

To show a violation of *Brady*, Plaintiff must establish that materially favorable evidence was suppressed. *See, e.g., Harris v. Kuba,* 486 F.3d 1010, 1014-15 (7th Cir. 2007) (listing the elements of a *Brady* violation). In this case, it is undisputed that Lewellen provided the key eyewitness testimony needed to convict Ruiz-Cortez. Without this crucial, believable testimony, Ruiz-Cortez would have had a reasonable probability of walking free, either because the Government probably would have lost at trial or because it would have chosen to drop the prosecution

altogether. Moreover, had the prosecution or defense known that Lewellen was involved in a drug conspiracy, Lewellen likely could not have provided believable testimony. His credibility would have been shot, and his testimony severely undermined by impeachment. But neither the prosecution nor the defense knew (or reasonably could have known) of Lewellen's illicit acts since he did not tell them.

Ergo, all the elements of a *Brady* violation are met. Defendant Chicago Police Officer Lewellen suppressed information by failing to disclose his participation in a criminal conspiracy. *See, Carvajal v. Dominguez,* 542 F.3d 561, 566 (7th Cir. 2008) ("While most commonly viewed as a prosecutor's duty to disclose to the defense, the duty [under *Brady*] extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation."). By engaging in such suppression, he denied the defense favorable evidence – evidence that would have allowed for impeachment of his credibility. *See*, *Harris,* 486 F.3d at 1016 ("To be favorable, evidence must be either exculpatory or impeaching."); *United States v. Silva,* 71 F.3d 667, 670 (7th Cir. 1995) ("[S]uppression of evidence relevant only for impeachment purposes can still give rise to a *Brady* violation. . . .").

Not only was it favorable and suppressed, the impeachment evidence was also material since, had it been known, there is a reasonable probability that "the result of the proceeding would have been different." *Kyles v. Whitley,* 514 U.S. 419, 434-35 (1995) (internal quotation marks omitted); *Pa. v. Ritchie,* 480 U.S. 39, 57 (1987) ("[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.") (internal alteration marks omitted); *Bielanski v. Cty. of Kane,* 550 F.3d 632, 643-44 (7th Cir. 2008). In this case, a reasonable probability of a different outcome (no conviction) exists regardless of whether Ruiz-Cortez actually possessed cocaine. This is due to the fact that Government's case depended almost entirely on Lewellen's testimony. *See, United States v. Bagley,* 473 U.S. 667, 689 (1985) ("If the testimony that might have been impeached is weak and also cumulative, corroborative, or tangential, the failure to disclose the impeachment evidence could conceivably be held harmless. But when the testimony is the start and finish of the prosecution's case . . . quite a different conclusion must necessarily be drawn."); *United States v. Wilson,* 481 F.3d 475, 480-81 (2007) (citing *Conley v. United States,* 415 F.3d 183, 189-91 (1st Cir.

2005), with approval for holding that "impeachment evidence [is] material because witness provided the only credible evidence against defendant").

A dirty cop may sometimes tell the truth, but the Government could not count on him being believed for it. And without believable incriminating testimony, even a guilty person may escape conviction. Lewellen's credibility therefore was crucial, and suppression of evidence that would have called that credibility into question violates *Brady*. The Supreme Court said as much in *Giglio v. United States,* 405 U.S. 150, 153-55 (1972).

In *Giglio,* the Court encountered a case where a co-conspirator, one Taliento, provided essential testimony against the defendant. As the Court described the situation, "the Government's case depended almost entirely on Taliento's testimony" and "without it there could have been no indictment and no evidence to carry the case to the jury." *Giglio,* 405 U.S. at 154. As such, Taliento's credibility was "an important issue in the case." *Id.* at 154-55. The Court therefore held that "the jury was entitled to know" evidence that would have called his credibility into question. *Id.* at 155. Keeping from the jury what it was entitled to know violates *Brady*. *See, id.* at 154-55; *Ienco v. Angarone,* 291 F.Supp.2d 755, 762 (N.D. Ill. 2003) ("[W]hen the reliability of a given witness may well be determinative of guilt

or innocence, nondisclosure of evidence affecting credibility falls within the *Brady* rule."), *aff'd,* 429 F.3d 680 (7th Cir. 2005). *Cf., Silva,* 71 F.3d at 671 (finding no *Brady* violation when the suppressed evidence was the "sordid past" of an informant since the informant's "credibility was not at issue in this trial, and thus evidence to impeach him would have been irrelevant").

This Court thus finds as a matter of law that Lewellen violated Plaintiff's due process rights by failing to disclose *Brady* materials. The Court is aware that it previously denied Plaintiff summary judgment on the same *Brady* claim. This may seem peculiar since "the standard for granting summary judgment mirrors the standard for judgment as a matter of law." *Reeves,* 530 U.S. at 150. But the Court had its reasons for denying summary judgment, despite acknowledging that Lewellen's conviction was "a matter of no genuine dispute." As it explained:

> What may be treated as a matter of no genuine dispute is Lewellen's criminal conviction for conspiring with Rodriguez. But the one case that Plaintiff cites to go from there to this Court granting him summary judgment actually features a denial of both the plaintiff's and the defendants' motions for summary judgment. *See, Thompson v. City of Chi.,* No. 07 C 1130, 2009 U.S. Dist. LEXIS 20348, at *7 (N.D. Ill. Mar. 12, 2009). Given the disposition of the opinion, the Court is frankly puzzled as to why Plaintiff cited it in his own Motion for Summary Judgment. Plaintiff's Motion is denied.

*Ruiz-Cortez,* 2016 U.S. Dist. LEXIS 148063 at *44. The Court thus denied Plaintiff summary judgment because of the complete lack of authority offered to justify granting it.

The Court also denied the summary judgment motion because Plaintiff overreached there, as he again does here. While Lewellen's conviction is a given fact, not all of the things that Plaintiff, relying on Rodriguez's testimony, said Lewellen did are things that the jury was required to believe him to have done (and then hid, thus violating *Brady*). Plaintiff insists that Rodriguez must be believed because his testimony was "unrebutted." But this is simply not true. Rodriguez did not testify at this trial and so was not cross examined live in front of the jury. However, his testimony, as offered during Lewellen's trial and read into the record here, was subject to cross examination at the time it was offered. The jury heard that cross examination. It knew that Rodriguez's testimony was rebutted; it was not required to believe him. *See*, *Reeves,* 530 U.S. at 150-51.

The fact of Lewellen's conviction is unrebutted and uncontradicted. But Lewellen has been convicted of one thing: conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 846. *See, United States v. Lewellen,* 09-CR-332-2, ECF No. 1345 (N.D. Ill. June 5, 2013). Many of the acts that Plaintiff insisted that Lewellen did

and covered up are unrelated to this conviction. For instance, relying on Rodriguez's testimony, Plaintiff said that Lewellen robbed two different drug dealers of their money. *See,* ECF No. 357 at 6-12. But robberies of money are not predicate acts to a conspiracy to distribute cocaine. Put differently, Lewellen may well have conspired with Rodriguez to possess and distribute cocaine without robbing anybody of their money. As such, Lewellen's conviction for the former does not establish as a matter of law that he did the latter.

The same reasoning applies to other bad acts allegedly committed by Lewellen, including those that are punishable under 21 U.S.C. § 846 if proved. For example, Plaintiff (parroting Rodriguez) said that Lewellen paid Rodriguez for his work as a confidential informant by giving him cocaine. He also said that Lewellen threw cocaine onto the balcony of somebody with whom he was angry so that the person would get arrested. While both of these things may be considered acts of cocaine distribution, the criminal jury may have found that Lewellen did both, only one, or neither one (because it believed he did something else). Because Plaintiff did not introduce evidence to establish what the criminal jury found that Lewellen did, he left the jury in this trial free to decide the issue. By its verdict, the jury indicated that it did not believe that Lewellen did any of the bad

acts (and then withheld the fact that he did them from Ruiz-Cortez). Absent evidence like a special jury verdict from Lewellen's criminal trial being introduced into the record, the Court does not know what the predicate acts were for which Lewellen was found guilty and so cannot contradict the jury.

To put things a different way, Plaintiff here faces a determinacy problem. The prosecution, through Rodriguez, accused Lewellen of having done many bad things; the criminal jury returned a verdict convicting Lewellen of one crime; Plaintiff failed to show which of those bad acts led to the conviction of the crime; as such, he has not established as a matter of law that Lewellen did any of those acts. He was entitled to convince the jury in this case that Lewellen did all of them, but he failed to persuade it that Lewellen did even one.

As a matter of law, therefore, Lewellen only did the things that were *necessary* to his criminal conviction. That is, he conspired to possess with intent to distribute 5 kilograms or more of cocaine. The situation is like that found in collateral estoppel cases, where only the issues necessarily decided in an earlier trial are estopped from being relitigated in a later trial. *See, Am. Family,* 193 Ill. 2d at 387-88 (listing the elements of collateral estoppel); *Sims v. Thompson,* No. 79 C 0458, 1983 U.S. Dist. LEXIS 11292, at *4-8 (N.D. Ill. Nov. 29, 1983)

(giving estoppel effect to the defendant prison guards' prior criminal conviction when the defendants were later sued in a civil lawsuit because the issues in the later case – whether the defendants conspired to attack the plaintiff – were necessarily decided at the criminal trial); *Cty. of Cook v. Lynch,* 560 F.Supp. 136, 138-40 (N.D. Ill. 1982) (similar). Accordingly, the Court concludes that Lewellen violated Plaintiff's *Brady* rights by failing to inform him that he conspired to possess with intent to distribute 5 kilograms or more of cocaine. He did not, as a matter of law, commit a *Brady* violation by failing to disclose other information.

For these reasons, the Court grants Plaintiff judgment as a matter of law to the extent that the nondisclosure of Lewellen's criminal conviction violated *Brady*. Nothing outside that conviction, however, is established as a matter of law. Because the Court finds Lewellen liable, albeit on circumscribed grounds, it orders a new trial on the issue of damages.

## B. New Trial

As an alternative to judgment as a matter of law, Plaintiff requests a new trial. Because Rule 50(c) requires a district court to rule conditionally on the motion for a new trial in the event that its decision granting judgment as a matter of law is

vacated or reversed, *see,* FED. R. CIV. P. 50(c)(1), the Court examines whether a new trial is appropriate in this case.

The Court "has great discretion in determining whether to grant a new trial." *Valbert v. Pass,* 866 F.2d 237, 239 (7th Cir. 1989). A new trial is appropriate where the verdict was against the weight of the evidence or the trial was otherwise unfair to the moving party. *See, e.g., Clarett v. Roberts,* 657 F.3d 664, 674 (7th Cir. 2011). A trial is unfair if "improperly admitted evidence had a substantial influence over the jury, and the result reached was inconsistent with substantial justice." *Christmas v. City of Chi.,* 682 F.3d 632, 639-40 (7th Cir. 2012) (internal quotation marks omitted). In other words, to warrant a new trial, the improperly admitted evidence must have "affect[ed] a substantial right of the party" or had a significant chance of swaying the jury's verdict. *See,* FED R. EVID. 103(a); *Barber v. City of Chi.,* 725 F.3d 702, 715 (7th Cir. 2013).

In exercising its discretion to grant or deny a new trial, the Court may weigh the evidence, assess the credibility of the witnesses, and judge the comparative strength of the facts presented at trial. *See, Mejia v. Cook Cty.,* 650 F.3d 631, 633 (7th Cir. 2011). Because the Court may perform this independent assessment of the evidence – something it cannot do in the context of a Rule 50 motion – it can more easily grant a new trial than it

can judgment as a matter of law.  *See, id.* at 634 (explaining that "a motion for a new trial may be granted even if a motion for judgment as a matter of law must be denied").

Despite this lower standard, the Court conditionally denies a new trial here.  The only reason that the Court would grant a new trial is the same reason that it granted judgment as a matter of law:  the verdict for Lewellen was against the weight of the evidence.  If the Court is wrong on the decision to grant judgment as a matter of law, however, then it would agree with the jury's verdict.  There was no unfairness in this trial and thus no reason to order a new trial.

Plaintiff argues otherwise, identifying four evidentiary rulings that he said resulted in unfairness.  These are:  (1) the manner of Lewellen's testimony and his Fifth Amendment invocation; (2) an allegedly improper comment by Lewellen's counsel during closing argument; (3) the admission of certain pieces of evidence used to impeach Plaintiff; and (4) the "exploitat[ion] [of] the grant of summary judgment in favor of the City of Chicago."  The Court dives into these arguments below despite agreeing with the defense that Plaintiff sparsely supported his claims.  Even though Plaintiff cited few authorities and misstated holdings, his arguments are not so lacking as to be considered waived.  However,

having done the dive, the Court finds little merit in Plaintiff's claimed errors, either individually or collectively.

### *1. Lewellen's Testimony and Fifth Amendment Invocation*

The parties knew that Lewellen would invoke his Fifth Amendment right to refuse to answer questions during trial, as he did at his deposition. Nonetheless, seeking to "maximize and dramatize the moment," Plaintiff wanted to call Lewellen as a witness "so the jury could watch him take the oath and then decline to answer a series of questions." *See,* ECF No. 336 at 4; *Evans,* 513 F.3d at 740. The Court exercised its discretion in granting that request only in part. *See,* ECF No. 336 at 5; *Evans,* 513 F.3d at 740. The Court allowed Plaintiff to call Lewellen, who was incarcerated in Florida, to the stand via video link. The Court further allowed Plaintiff to ask Lewellen a number of questions, each of which Lewellen was to answer or assert the Fifth. However, both parties knew that Lewellen would decline to answer all questions. The Court therefore restricted Plaintiff's questions to "no more than [is] needed to establish the subject matter of the testimony" and directed that the parties thereafter proceed by stipulation that Lewellen would remain silent as to similar questions. *See,* ECF No. 336 at 5. As the Court explained in its *in limine* ruling, this manner of presentation of the

testimony balanced Plaintiff's interest in effectively presenting his case against the risk of undue prejudice to Lewellen. *See, id.*

In accordance with the Court's ruling, Plaintiff was able to ask Lewellen questions regarding whether he fabricated evidence against Ruiz-Cortez, protected Rodriguez from prosecution, and engaged in specific criminal acts. *See,* Trial Tr. 453:2-455:7. Lewellen stood by his Fifth Amendment invocation. *Id.* The Court then explained to the jury that both sides agreed that "[t]he Defendant, Lewellen, is asserting the Fifth Amendment in response to all questions that are relevant to the plaintiff's case. If asked any such additional questions, were we to ask Mr. Lewellen, he would similarly assert his – the Fifth Amendment." *Id.* at 455:11-23. As part of its jury instructions, the Court also said to the jury: "You have heard testimony in this case from persons asserting their Fifth Amendment rights. You may, but are not required to, infer from the witness's assertion of their Fifth Amendment privilege that the witness's testimony in response to those questions would have been adverse to them." ECF No. 348.

Plaintiff now charges that this manner of presentation to the jury "was in contradiction of the rulings of the Seventh Circuit." ECF No. 357 at 22. Despite this bold statement leaning on "the rulings of the Seventh Circuit," Plaintiff cited not a single Seventh Circuit ruling. Instead, he directed the Court to one

statement by Judge Sykes during an oral argument and a district court decision.  The Court read the opinions produced in both cases and found nothing in them that disallowed what it did here.

In *Thompson v. City of Chi.,* 722 F.3d 963 (7th Cir. 2013), the Seventh Circuit did not touch on the presentation of a Fifth Amendment invocation.  It did say that the district court "retains considerable latitude even with admittedly relevant evidence" and only "abuses its discretion if it so limits the evidence that the litigant is effectively prevented from presenting his or her case." *Id.* at 971.  As noted, the Court considered Plaintiff's ability to present his case effectively in ruling on how Lewellen was to testify.  This was why the Court allowed Plaintiff to call Lewellen to the stand, put him under oath, and ask him the necessary questions.  The Court also considered the prejudicial effect of dramatizing the inquiry and so proceeded by stipulation after the initial questions. Plaintiff has pointed to nothing to indicate that this ruling was abusive, other than that the jury returned a verdict against him.  But an adverse verdict by itself cannot show error – a party loses at the end of every trial after all.

Likewise, the second case that Plaintiff cited, *Jimenez v. City of Chi.,* 877 F.Supp.2d 649, 671-72 (N.D. Ill. 2012), offered no support to his position.  In *Jimenez,* the district court found

that it did not commit an abuse of discretion by calling a witness to the stand instead of letting him stipulate that he would assert his Fifth Amendment privilege if called. *Id.* However, just because it is not an abuse of discretion to opt against a stipulation does not imply that it *is* abuse to proceed (partly) by stipulation. Indeed, the *Jimenez* court made just this point in the context of jury instructions, stating "[t]he fact that the Court has given instructions similar to the ones defendants requested here in a previous case does not mean that the Court committed a legal error requiring a new trial by not doing so in the present case." *Id*. at 665.

Furthermore, the Seventh Circuit has found that proceeding by stipulation alone is not an abuse of discretion in at least some circumstances. *See, Evans,* 513 F.3d at 740-41 ("The judge instructed the jurors that they could draw an adverse inference as to liability based on [the defendant] Dignan's assertion of the Fifth Amendment to questions about the case. There is no reason to think that the jurors ignored the instructions. . . . The jury's verdict indicates that it declined to draw a negative inference from Dignan's assertion of his Fifth Amendment rights. Given this state of affairs, we find no error in how Judge Coar decided to [present Dignan's Fifth Amendment assertion to the jury by stipulation alone]."). A stipulation thus is not *per se*

unreasonable, and Plaintiff has not given the Court any reason to think that it was unreasonable in this case.

Just as the Court finds no error in the presentation of Lewellen's testimony, it finds nothing particularly improper in the preamble to Lewellen's assertion of the Fifth Amendment. After Lewellen was called to the stand and put under oath, he said, "Mr. Smith, as I'm – as I'm currently in the process of challenging my federal case, I have been advised by my criminal lawyers to decline to answer any questions under my Fifth Amendment. Mr. Smith, I would love to testify in this –" at which point he was interrupted by Plaintiff's objection and did not continue. *See,* Trial Tr. at 453:12-16. The Court then instructed Lewellen to "[a]nswer the question and do not go on and explain your answer. Just take – either answer the question or decline to answer, sir." *Id.* at 453:25-454:2. Defendant then dutifully stated, "I stand by my previous statement and take the Fifth" to every question thereafter. *See, id.* at 454:3-455:6.

Plaintiff complains that what Lewellen said allowed him to "look[] into the camera like a boy scout and lament[] that a mere technicality foreclosed him from speaking." ECF No. 357 at 22. Of course, Lewellen never said that a mere technicality kept him from answering. Instead, he stated that he "decline[d] to answer any questions" on the advice of his criminal lawyers. This is

- 34 -

clearly proper.  *See, Evans,* 513 F.3d at 740 n.4 (stating that a
witness's invocation of the Fifth Amendment may consist of the
"mundane" statement, "On the advice of counsel, I decline to
answer.").

Plaintiff is unhappy with the words surrounding that
"mundane" statement, however.  First, he takes issue with the
proffered "I'm currently in the process of challenging my federal
case."  His argument as to why this is inappropriate boils down to
nothing more than what he said in his motion *in limine* – an
argument that the Court rejected.  Plaintiff contends that
Lewellen's Fifth Amendment invocation must "indicate the
possibility of criminal sanctions without providing alternate
excuses."  ECF No. 365 at 2-3.  According to Plaintiff, the
statement that Lewellen was in the middle of an appeal is an
"alternate excuse" and therefore impermissible.  The Court cannot
agree with such a narrow view of a proper Fifth Amendment
invocation.

It is the case that "[t]o be privileged by the Fifth
Amendment to refuse to answer a question, the answer one would
give if one did answer it (and answer it truthfully) must have
some tendency to subject the person being asked the question to
criminal liability."  *In re High Fructose Corn Syrup Antitrust
Litig.,* 295 F.3d 651, 663-64 (7th Cir. 2002).  However, this

principle cannot be taken to imply that any other reason for taking the Fifth besides risk of criminal liability is illegitimate and therefore cannot be articulated to a jury. If that were the case, there would be no basis for a jury ever to decline making a negative inference from a witness's invocation. But, as we know, such a negative inference is permissive, not required. *Evans,* 513 F.3d at 741.

In particular, a witness ought to be able to reveal a pending appeal since reticence to speak in the face of ongoing litigation is something a reasonable jury can balance against the tendency to incriminate oneself. *See, In re High Fructose Corn Syrup,* 295 F.3d at 664 (finding that when the witnesses "had exhausted their appellate remedies," refusal to answer questions was explainable only by the risk of criminal liability); *Padilla v. City of Chi.,* 932 F.Supp.2d 907, 919 (N.D. Ill. 2013) ("[A] defendant seeking to avoid the weight of a negative inference must advance something explaining a reason for his or her Fifth Amendment invocation other than guilty conduct associated with the civil action."). In sum, Lewellen may say just what he did – that he was invoking his Fifth Amendment rights because he had an appeal pending. The Court may do what it did – instruct the jury that it may infer from Lewellen's silence that his truthful answers would have been

adverse to him and thereby put jurors on notice of the tendency to liability.  There is no error thus far.

As to the added "I would love to testify," this was a brief statement said just once.  The Court is not convinced that what Lewellen said allowed him to "look like a boy scout" and so escape liability.  Lewellen testified from prison; the jury knew that he has been sentenced to an incarceration term of 18 years for the crime that he committed; it heard an abundance of testimony on his supposed criminal activities.  Plaintiff's hyperbole aside, the probability that the jury found Lewellen not liable because of the few words he said when invoking his Fifth Amendment privilege is negligible.  If the statement was error, it was harmless error. *See*, *Jones v. Lincoln Elec. Co.,* 188 F.3d 709, 725 (7th Cir. 1999) ("An error is considered to be harmless if it did not contribute to the verdict in a meaningful manner.").

### 2. Defense Counsel's Closing Statement

Related to his objections regarding Lewellen's Fifth Amendment invocation, Plaintiff also accuses defense counsel of improperly vouching for his client.  According to Plaintiff, a statement that defense counsel made during closing argument "insinuated . . . that the jury should trust *him* that Lewellen asserted the Fifth Amendment for reasons other than the tendency

to incriminate." *See,* ECF No. 357 at 24. The objected-to statement that counsel made during closing argument is this:

> This case is incredibly important to the parties. It's also incredibly important to the attorneys. It's also incredibly important for what it represents in our society at large because I stand here not just on behalf of a client. I stand here as an officer of the court. And I have a solemn oath to uphold the integrity of our judicial system. I take that –

Trial Tr. at 877:25-878:6. Plaintiff then objected, and the Court overruled his objection. Defense counsel continued without further objection to say, "And I take my job very, very seriously. You may have noticed that. If I have offended any of you by being overzealous, I apologize. I'm a very passionate person, and I take – I take this very, very seriously." *Id.* at 878:12-15.

The Seventh Circuit has "repeatedly stated that comments made by attorneys during closing arguments rarely rise to the level of reversible error." *See, e.g., Willis v. Lepine,* 687 F.3d 826, 834 (7th Cir. 2012); *Pickett v. Sheridan Health Care Ctr.,* 610 F.3d 434, 445 (7th Cir. 2010); *Valbert,* 866 F.2d at 241. Counsel's comment in this case is not one of those rarefied reversible errors. Indeed, the Court is not convinced that there was error at all.

Counsel's statement on its face did not bolster Lewellen's credibility in any way. Counsel was perhaps vouching for his own "overzealousness" and "passion," explaining to the jury that he is

- 38 -

"an officer of the court" who takes his job "very, very seriously." But this is far from "insinuat[ing] to the jury that they should trust" Lewellen because counsel trusted Lewellen or that they should trust counsel that Lewellen was asserting his Fifth Amendment privilege for reasons unrelated to the risk of criminal liability. ECF No. 357 at 24. Counsel himself did not mention Lewellen; he did not hint at Lewellen's trustworthiness; he did not say he trusted Lewellen; he did not refer to his client's Fifth Amendment invocation. Plaintiff's imputed meaning to what counsel said thus stretches the words beyond their natural significance. The Court did not think that counsel's comments were improper when he said them, and it does not think so now.

Furthermore, even if what counsel said was not based on the evidence before the jury, the Court twice instructed jurors not to treat counsel's statements as evidence. Before the parties stood up to deliver their closing arguments, the Court said to the jury: "What I said about opening statements is also true for closing arguments. It's the attorney's opportunity to argue to you, tell you how you ought to interpret the evidence and how you ought to decide the case, but what the attorneys say is not evidence." Trial Tr. 856:12-20. In its jury instructions, the Court said the same thing again. *See*, 907:3-908:18.

Juries are presumed to follow their instructions. *See,*
*Jones,* 188 F.3d at 732 ("[C]ourts must presume that juries heed
limiting instructions that closing arguments are not to be
considered evidence."). While the presumption may be overcome,
*see, Barber,* 725 F.3d at 716-17, Plaintiff has given the Court no
reason to think that happened here. Instead, Plaintiff points
(again) only to the fact that he lost. This is not enough. *See,*
*Smith v. Hunt,* 707 F.3d 803, 812 (7th Cir. 2013) ("As proof that
the jury could not follow the instructions given, Smith offers
nothing other than the fact that it decided against him. We do
not think that is enough.").

Finally, counsel's brief comments, unrepeated anywhere else,
cannot have caused the kind of harm that justifies a new trial.
As the Seventh Circuit explained, "[t]o warrant a new trial,
statements made during closing argument must be plainly
unwarranted and clearly injurious to constitute reversible error."
*Jones,* 188 F.3d at 730 (7th Cir. 1999). This standard is
difficult to meet when followed by instructions like the kind the
Court gave here. *See, Valbert,* 866 F.2d at 241 ("[A]n instruction
to the jury stating that the arguments of counsel are not evidence
can mitigate the harm potentially caused by improper statements
made by counsel during closing argument."); *Willis,* 687 F.3d at
834 (finding that "the judge's instruction to the jury that

statements made by the attorneys are not evidence was sufficient to remedy any harm that may have been caused by defense counsel"). It is even more difficult when "the comment is merely a brief and unrepeated part of a lengthy argument." *Valbert,* 866 F.2d at 241; *see also, Christmas,* 682 F.3d at 641 (affirming a denial of a new trial when the asserted basis for relief was an "isolated comment [] made during the course of a weeklong trial and was adequately addressed by the district court through a curative instruction"). Here, the objected-to portion of counsel's comments was a mere five sentences delivered as part of a closing argument that spanned 22 pages when transcribed. *See*, Trial Tr. 877-899. Under such circumstances, the Court finds neither error nor harm in the comment.

### 3. *Admission of Certain Evidence*

Plaintiff further claims errors with three of the Court's evidentiary rulings: the admissions of Plaintiff's aliases, his tax payments, and the Mendez report.

The complaint of error regarding Plaintiff's use of aliases is without merit. While there are limits on how a party may confront a witness with the witness's use of false names and thereby impeach his honesty, *see, Thompson,* 722 F.3d at 976-78, those limits were strictly observed here. Plaintiff was asked about his use of one alias; he answered two questions on the

subject matter; he was allowed to say that he used the alias on "more than one occasion" without revealing any details about those occasions. *See,* Trial Tr. 552:13-554:15. This is far from the situation that the Seventh Circuit found improper in *Thompson.* There, the "odd and elaborate" method of questioning Thompson about his use of aliases on 12 different "important event[s] in [his] life" transparently conveyed to the jury that he had been arrested 12 times. Thompson thus was unduly prejudiced by the revelation of his arrest record; no such prejudice occurred here.

Next, Plaintiff takes issue with the Court's ultimate decision to allow questions into Plaintiff's lack of tax payments. Plaintiff had said during his deposition that he did not pay taxes and, when prompted, agreed that the reason was because his income fell below the filing threshold. At trial, however, he testified to making much more money. The filing thresholds and missing tax payments therefore became relevant to impeach Plaintiff's trial testimony that he was earning good wages and therefore had no incentive to store drugs for money. Because Plaintiff opened the door to the issue with his trial testimony, the Court reversed its earlier *in limine* decision and admitted evidence related to the taxes and income filing thresholds.

Altering an *in limine* ruling is within the sound discretion of the Court. *See, Luce v. United States,* 469 U.S. 38, 41-42

(1984) ("[T]he district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."); *Farfaras v. Citizens Bank & Tr.,* 433 F.3d 558, 565 (7th Cir. 2006); *Betts v. City of Chi.,* 784 F.Supp.2d 1020, 1023 (N.D. Ill. 2011) ("Rulings on motions *in limine* are preliminary; the district court may adjust a motion in limine during the course of a trial.") (internal quotation marks omitted). The Court did not abuse its discretion by adjusting its earlier *in limine* decision, and the ultimate ruling admitting the evidence was the correct one. The evidence became especially relevant due to the length and specificity of Plaintiff's testimony regarding how much money he was making, how little his expenses were, and how financially comfortable he felt. *See,* Trial Tr. at 506:10-11; 508:6-8; 511:15-512:20; 580:7-583:25; 618:14-624:4 ("Q: Now, you testified quite extensively yesterday about how you were making such good money during the time period before your arrest, right? A: Yes."); 855:7-16. Given the probative value of the evidence, the risk of undue prejudice to Plaintiff (if any) did not warrant excluding the evidence. *See,* Fed. R. Evid. 401-403; *see also*, *Thompson,* 722 F.3d at 971 ("The district court has wide discretion in admitting and excluding evidence. . . .").

Third, Plaintiff argues that a statement he made to law enforcement that was memorialized in a report (the Mendez report)

should not have been admitted to impeach his account of coercion. This really is the identical argument that he made in his motion *in limine*. *See,* ECF No. 336 at 7-8. The Court there explained that the document was admissible under Rule 803(5) of the Federal Rules of Evidence to refresh Officer Mendez's recollection as a witness, and the underlying statements, consisting of what Plaintiff said to law enforcement, were admissible as admissions of the party opponent under Rule 801. *Id.* at 8. It said the same thing at trial when Plaintiff renewed his objection. *See,* Trial Tr. at 745:14-746:9. As to the actual use of the report, the defense was careful to refresh Mendez's recollection with the document prior to his offering testimony, and the Court allowed the testimony but declined to admit the report as an exhibit pursuant to Rule 803(5). *See, id.* at 752:10-763:2; FED. R. EVID. 803(5) ("If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party."). The Court thus finds for the third time that the evidence is admissible.

In sum, Plaintiff has not identified any error with the Court's evidentiary rulings.

### *4. Grant of Summary Judgment to the City of Chicago*

Plaintiff's last argument for a new trial is brief to the point of vagueness. Plaintiff appears to argue that the grant of

summary judgment to the City of Chicago somehow hampered his
ability to present his case against Lewellen at trial. But he
says this without citing to any place in the trial transcript
showing where a piece of evidence that he wished to admit was
excluded or admitted when he wished it excluded. The Court thus
has no way to determine the supposed error, whether Plaintiff
preserved his right to contest it, or the effect of the error on
Plaintiff's substantial right.

What Plaintiff did say in the short paragraphs he devoted to
the argument was no more illuminating. He claims that after the
Court dismissed the *Monell* claim against the City, he "could not
describe how the City's policies led to the abuse of innocent
citizens such as himself." ECF No. 357 at 26-27. The Court
dismissed the *Monell* claim because Plaintiff failed to make out a
City policy that caused his constitutional harm. *See, Ruiz-
Cortez,* 2016 U.S. Dist. LEXIS 148063 at *64-79. Plaintiff is not
here contesting that decision. Ergo, it stands to reason that
since he could not pinpoint a City policy that led to his harm, he
cannot describe how such a nonexistent policy "led to the abuse of
innocent citizens such as himself." This is tautological
inevitability, not error.

### 5. *Cumulative Prejudicial Error*

Lastly, the Court considers whether the asserted errors, even if harmless on their own, cumulatively resulted in prejudice justifying a new trial. *See, Barber,* 725 F.3d at 715. As to the evidentiary objections discussed above, the Court summarily finds no cumulative prejudice: Plaintiff has not made even the threshold showing that there was more than one error. *See, Christmas,* 682 F.3d at 643 (stating that prejudice from a cumulative effect requires that "*multiple* errors occurred at trial") (emphasis added) (internal quotation marks omitted); *United States v. Conner,* 583 F.3d 1011, 1027 (7th Cir. 2009) ("In order for the cumulative effect doctrine to apply, the plaintiff must first show that more than one error occurred.").

There is a more general issue, however. Plaintiff appears to argue that it was "jury nullification" for the defense to have engaged in the "diversionary" tactic of poking holes in his story that he stored drugs to protect his family. *See*, ECF No. 357 at 1-3. Plaintiff goes so far as to say that "[t]he jury in this case was not deciding whether Ruiz was coerced into taking the drugs into his apartment." *Id.* at 16. He thus seems to assert that any evidence introduced tending to cast doubt on the coercion story was irrelevant and therefore admitted in error.

The argument is baffling. While it is true that whether Plaintiff was coerced into holding drugs is irrelevant to the question of whether Lewellen violated Plaintiff's *Brady* rights, Plaintiff chose to make his coercion a central theme of the trial. Having put the issue into play, he cannot now complain that evidence tending to make the alleged coercion more or less probable is irrelevant. *See,* FED. R. EVID. 401.

In other words, the jurors in this case were deciding "whether Ruiz was coerced into taking the drugs into his apartment" precisely because Ruiz-Cortez asked them to do so. He pleaded for the jury to consider his lack of culpability in assessing Lewellen's liability and deciding on a damages award. The Court suspects that the size of that award is the reason coercion became an issue at trial, even though Plaintiff's attorneys knew that they did not have to litigate the point. In any case, given Plaintiff's freely chosen trial strategy, it cannot be error for the defense to introduce evidence tending to lessen the success of that strategy. *See,* FED. R. EVID. 401-402; *see also, Walden v. City of Chi.,* 846 F.Supp.2d 963, 973 (N.D. Ill. 2012).

In looking forward to the new trial on damages, the Court is of the view that evidence shedding light on whether Plaintiff was coerced into storing drugs is relevant for determining the amount

of damages.    Plaintiff's whole strategy seems an implicit admission of that fact, and he may have admitted so in his latest brief, writing that "[a]t best Defendants' argument [casting aspersion on the coercion theory] was related to damages." ECF No. 357 at 3.    Nonetheless, if there is a dispute now between the parties on the issue, then they should brief it before the new trial begins.

## III.    <u>CONCLUSION</u>

For the reasons stated herein, the Court grants in part Plaintiff Ruiz-Cortez's Motion for Judgment as a Matter of Law [ECF No. 357] and orders a new trial on the issue of damages. Pursuant to Fed. R. Civ. P. 50(c)(1), the Court rules that in case this judgment is later vacated or reversed, it conditionally denies the Motion for a New Trial.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: May 15, 2017